[S. F. No. 5871.  Department Two.—May 9, 1913.]

## HARTLAND LAW and HERBERT E. LAW, Appellants, v. THE NORTHERN ASSURANCE COMPANY OF LONDON (a Corporation), Respondent.

FIRE INSURANCE—PAROL CONTRACT—NATURE OF PROOF.—While a parol contract of fire insurance may be made, proof of such an agreement must be clear and convincing, because, ordinarily, such insurance is obtained by the issuance of elaborate written policies.

ID.—ACTION ON PAROL CONTRACT—PLEADING MUST SHOW.—Such being the rule, it follows that where an oral agreement of insurance is the basis of an action it must be set forth in the complaint.

ID.—PRESENT ACTION NOT BASED ON PAROL CONTRACT—EXPRESS WRITTEN CONTRACT—COVERING NOTE.—In the present case it is held, upon a review of the allegations of the complaint and the evidence, that the contract of fire insurance entered into between the parties was not a parol contract, but was a specific written contract embodied in a "covering note," which by its express terms had expired prior to any loss to the insured building.

ID.—CONSTRUCTION OF COVERING NOTE—CONTRACT OF PRESENT INSURANCE—AMBIGUITY.—A covering note reading as follows: "Covering Memo. No. 21424, The Northern hereby secures H. & H. E. Law against loss or damage by fire, to the extent of (but not exceeding) $25,000 on brick and stone hotel bldg. 'C. O. C.' Fairmont—San Francisco, Cal. "This memorandum to be subject to all the terms and conditions of the Company's General Policy of Insurance, which are made a part of this contract, and the basis of this agreement. Insurance hereunder to cease 30 days from this 19th day of March, 1906, at noon, or at such time prior thereto as this company's policy may be issued," which was signed by an agent for the insurance company, and which had printed in large letters across its face the words "This covering memo. must be returned with the application,"—constitutes a contract of present insurance, and the fact that it was written upon the printed blank of another company, with appropriate cancellations of such other company's name, and the insertion of the name of the insurer, does not detract from its clearness nor render it ambiguous.

ID.—ABBREVIATION OF NAME OF INSURER.—Such contract is not rendered materially ambiguous by the use of the abbreviation "Northern" instead of the full title of the insurer, when it appears from the testimony of the agents of the respective parties who made the contract that they meant the defendant company when they used that term, and the complaint alleges that the defendant (naming it formally) issued the covering note.

ID.—DESCRIPTION OF PROPERTY.—The reference to the property insured as the Fairmont Hotel in San Francisco is a sufficiently definite description.

ID.—REFERENCE TO GENERAL POLICY.—No ambiguity arises from the reference to the "Company's general policy of Insurance." That expression simply served to make the general policy a part of the covering note.

ID.—TECHNICAL ABBREVIATION—LETTERS "C. O. C."—EVIDENCE.—The letters "C. O. C.," being a technical abbreviation, could be explained to mean "in course of construction." The testimony of experts in insurance matters was admissible to show their meaning.

ID.—CONSTRUCTION OF INDORSEMENT—APPLICATION FOR INSURANCE.—The words "This covering memo. must be returned with the application," printed across the face of the contract, does not render the contract ambiguous, or convert the writing into a mere application for insurance.

ID.—FAILURE TO SPECIFY PREMIUM—IMPLIED AGREEMENT FOR CUSTOMARY RATE.—The failure of the covering note to specify any rate of premium did not render the contract ambiguous, as an agreement to pay a premium at the customary rates was implied.

ID.—DENIAL OF NONSUIT—EVIDENCE DEMANDING CONSTRUCTION OF CONTRACT BY JURY.—Where the loss sued for occurred after the expiration of the thirty days' limitation mentioned in such covering note, the failure of the trial court to grant the defendant's motion for a nonsuit, was not equivalent to a ruling that the contract sued on was a parol contract of insurance and not such covering note, where there was evidence that the letters "C. O. C." in the covering note involved a promise of continued insurance notwithstanding the distinct limitation expressed in the writing.

ID.—ATTEMPT TO RENEW COVERING NOTE—EVIDENCE DISPROVING ORAL CONTRACT.—The fact that the insured, prior to the expiration of the covering note, endeavored to have a formal extension thereof indorsed on the instrument, is a strong circumstance against the existence of any asserted oral contract of insurance contradictory of its terms.

ID.—REFUSAL OF GENERAL AGENT TO RENEW COVERING NOTE.—The general agent of the insurer, when applied to for an extension of the covering note, had the right to refuse to renew it, notwithstanding the insurance had been secured by his city agent.

JURY TRIAL—SPECIAL ISSUES—IMMATERIAL ERROR IN INSTRUCTION IN REFERENCE TO VERDICT.—Where special issues were submitted to the jury, the fact that the court reversed the requirements of section 625 of the Code of Civil Procedure (as it existed at the time of the trial), by requiring answers to the special issues whether the jury found a general verdict or not, was without prejudice, if the jury did find a general verdict.

Id.—Form of Special Interrogatories—Answers "Yes" or "No" Permissible.—While section 625 of the Code of Civil Procedure (as then existing), did not require the court to frame the interrogatories submitted to the jury so that they might be answered by single words of negation or affirmance, it did not prohibit them from being so framed. If so framed, it was proper for the court to instruct the jury that their answers to the questions should be "yes" or "no."

Id.—Variance Between Special and General Verdicts.—It is held that there is no such variance between the findings of the jury on certain special issues submitted to them and the rest of the findings and the general verdict as to warrant a reversal of the judgment.

Id.—Construction of Special and General Verdicts—Intendment in Favor of General Verdict.—No presumption will be indulged in favor of answers of the jury to special interrogatories as against the general verdict; but on the contrary, every reasonable intendment in favor of the general verdict should be indulged, and all parts of the verdict are to be reconciled in support thereof, if it can reasonably be done.

Id.—Special Finding When Inconsistent.—A special finding is inconsistent with the general verdict only when, as a matter of law, the special finding when taken by itself would authorize a judgment different from that which the general verdict will permit.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order refusing a new trial. John J. Van Nostrand, Judge.

The facts are stated in the opinion of the court.

James Alva Watt, for Appellants.

T. C. Van Ness, and H. B. M. Miller, for Respondent.

MELVIN, J.—Plaintiffs sued for twenty-five thousand dollars insurance upon the Fairmont Hotel, a building in the city and county of San Francisco, which was partially destroyed in the great conflagration that commenced on the eighteenth day of April, 1906. Respondent answered denying the existence of any policy of insurance for twenty-five thousand dollars issued by it in favor of the plaintiffs, except a certain "covering note" set forth in the complaint, and shown in the transcript by photographic copy. The answer alleged that said "covering note" expired by its terms

thirty days from March 19, 1906; that it was not renewed; and that the Fairmont Hotel was not damaged by fire until the morning of the 19th of April, 1906, after the expiration of said covering note. The case was tried before a jury and a general verdict was rendered in favor of the defendant. The jury also returned answers to certain special interrogatories propounded on request of the parties to the action. From the judgment based on said verdicts and from the order denying their motion for a new trial the plaintiffs prosecute this appeal.

In the complaint it is alleged that on March 19, 1906, the defendant corporation, ''for a valuable consideration, agreed with the plaintiffs to insure, and then and there did insure the plaintiffs against loss or damage by fire, to the said building while in course of construction and not exceeding a term of one year from the said 19th day of March, 1906, at noon, to the 19th day of March, 1907, at noon, and to an amount not exceeding $55,000 and thereupon issued and delivered to the plaintiffs the two certain paper writings or covering notes, one for the sum of $30,000 and the other for the sum of $25,000.'' The covering note for $25,000 is written upon a blank form, at the top of which appears the words and figures: ''Covering Memo. No. 21424.'' Just below in printed characters is the word ''The'' followed by a bracket after which are the printed titles, one above the other: ''National Fire Insurance Company,'' ''Springfield Fire and Marine Ins. Co.,'' these followed by another bracket. These titles have been canceled by lines drawn through them and the word ''Northern'' has been written in front of them. Omitting printing which can have no possible relevancy, the document then reads: ''Covering Memo. No. 21424, The Northern hereby secures H. & H. E. Law against loss or damage by fire, to the extent of (but not exceeding) $25,000 on brick and stone hotel bldg. 'C. O. C.' Fairmont—San Francisco; Cal.''

''This memorandum to be subject to all the terms and conditions of the Company's General Policy of Insurance, which are made a part of this contract, and the basis of this agreement.

"Insurance hereunder to cease 30 days from this 19th day of March, 1906, at noon, or at such time prior thereto as this company's policy may be issued.

"L. B. CHASE,<br>"For Company.

"Dated S. F. 3/19/06."

Below is the word "National" and a dollar sign, both printed, followed by the written figures, "25,000."

Printed in large letters across the face of the instrument are the words "This covering memo. must be returned with the application."

It is further alleged in the complaint that "it was agreed by and between the plaintiffs and the defendant that the said covering notes should be continued and renewed from time to time and kept in force while the said building was in course of construction, for the term not exceeding one year from the said 19th day of March, 1906, at noon.

"That on the 17th day of April, 1906, the defendant, pursuant to its foregoing agreement, for a valuable consideration, renewed and agreed to continue in force the said insurance to the aggregate amount of $55,000 and thereupon indorsed upon the said covering note for $30,000, a memorandum of the said renewal and agreement and at the same time for a valuable consideration, agreed to indorse upon the said covering note for $25,000, a copy of which is hereinbefore contained, a memorandum in writing of the said renewal and agreement and thereafter, to wit: on the 18th day of April, before noon, the plaintiffs presented the said covering note for the sum of $25,000, at the office and place of business of the defendant in the city and county of San Francisco, for the purpose of procuring the indorsement in writing on said covering note of said renewal and agreement and for the purpose of declaring the insurance thereunder and of demanding the issuance to the plaintiffs by the defendant of its formal contract or policy of insurance in accordance with the terms and provisions of the said covering note, and the plaintiffs did then and there demand from the defendant indorsement in writing on said covering note of said renewal and agreement and did then and there demand of and from the defendant the issuance of its general policy of insurance in accordance with and as provided in and by the terms of

said covering note, but the defendant did not make said or any indorsement and did not issue to the plaintiffs its policy of insurance for said sum of $25,000 and although demanded by the plaintiffs, the defendant refused and still refuses to issue said policy."

The general policy of insurance of the defendant company is fully set forth in the pleading and one of the paragraphs of the said covering complaint is as follows:

"That the plaintiffs have performed all of the conditions, covenants and stipulations in the said covering notes and in the general policy of insurance therein referred to, on their part to be performed, and have tendered to the defendant in lawful money of the United States, payment of the premium upon said insurance for the term of one year."

The principal controversy, and indeed the vital matter of difference between the parties to this appeal relates to the sort of contract pleaded and proven by the plaintiffs. B. B. Sturtevant was a broker employed by plaintiffs to place insurance on the Fairmont Hotel property. He and Frank L. Hunter, the resident manager of the defendant company, were intimate friends. On March 17, 1906, they met, and, according to Mr. Hunter, the following conversation took place: "Either I or someone else in the party said, 'Ben, I assume you will place the insurance on the Fairmont if the Law Bros. take out insurance,' and he says 'Yes, I expect to.' He turned around then to me and says: 'Frank, I will give you a line,' and I said 'Thank you Ben.'" Later, the covering note for $30,000 (the one that was renewed and that was paid after the fire) was issued by Mr. Naunton, who was employed in Mr. Hunter's office. H. C. Ahpel was the city agent of the defendant corporation, and L. B. Chase (the man who signed the covering note here discussed) was in his employ. Mr. Ahpel kept an office separate from that of Mr. Hunter, and although the latter was the officer having general authority over all of defendant's other agents in San Francisco, no business obtained by Mr. Ahpel or his office force was ever renewed at Mr. Hunter's office. The broker for the plaintiffs was also a friend of Mr. Ahpel. On March 19, 1906, they met and Mr. Sturtevant said to Mr. Ahpel: "Henry, I have just got a line on the Fairmont that I can give you." After some conversation, in which Mr. Ahpel

learned that the building would be completed in October or November, he agreed to take $25,000 of the insurance. He asked Mr. Sturtevant if he, Ahpel, would "get the renewal" and the reply was "Sure, Henry."

It is the contention of the plaintiffs that the complaint sufficiently alleges an *oral* contract of insurance; that the "covering note" is so ambiguous as not to amount to a complete contract in itself and does not therefore contain the substance of the agreement between the parties; and that the conversations between the broker for the plaintiffs and the agents of the defendant corporation, when interpreted in the light of the custom among insurance men, amounted to a verbal agreement by which the company insured the building, for twenty-five thousand dollars, during construction, without payment of premium, upon the consideration of the promise that when the hotel should be completed, a regular policy of the defendant should be issued at the customary rates. As bearing upon the meaning of the promised renewals, counsel for plaintiffs calls our attention to a rule of the board of fire underwriters proven at the trial, whereby members are permitted to issue *policies* upon buildings in course of construction provided they should be indorsed as follows:

"It is hereby understood and agreed that this policy shall be canceled without cost to the assured, no claim for loss having been made hereunder, providing the policy be issued by this company to take effect on the same day on which this policy is canceled, and covering same property for no less amount and for the term of (1 or 3 years). The policy to be so canceled and rewritten as soon as the structure is completed, and the building ready for occupancy."

It is the theory of appellants, supported by some testimony, that the same rule applied to "covering notes" and that the letters "C. O. C." taken in connection with the agreement for the "renewals" amounted to a contract that the building would be kept insured without payment of premium until its completion, at which time a regular policy of insurance would issue. Taking these contentions in their order, we fail to see how the complaint supports any such theory as that advanced by counsel for appellants. There is no distinct allegation of an oral contract, and while a parol contract of insurance may be made, proof of such an agreement must be

clear and convincing, because, ordinarily, insurance is obtained by the issuance of elaborate written policies. (*American Can Co.* v. *Agricultural Ins. Co.*, 12 Cal. App. 135, [106 Pac. 720]. Such being the rule it follows that where an oral agreement of insurance is the basis of an action, it must be set forth in the complaint. An examination of the complaint (of which the portions here material have been quoted above) shows that no such oral contract is specifically pleaded. True, the complaint contains an averment that there was an agreement for the renewal of the "covering notes," but that is very different from a statement that a parol contract of insurance existed. The complaint is evidently drawn upon the theory that the "covering notes" were the contracts entitling the plaintiffs to the insurance money in case of loss by fire, and in pleading performance on their part plaintiffs do not set up compliance with a verbal agreement, but performance of the "conditions, covenants and stipulations" of the "covering notes" and the "general policy of insurance therein referred to."

We do not agree with the views of the counsel for plaintiffs regarding the alleged ambiguity of the covering note for twenty-five thousand dollars. The fact that it was written upon the blank of another company detracts not in the slightest degree from its clearness. The cancellations which are here described removed all possibility of the contract being mistaken for that of one of the corporations which had its name printed on the form. Nor does the use of the abbreviation "Northern" instead of the full title of the insurance company constitute a material ambiguity. It appears from the testimony of the agent for plaintiffs and the representative of the defendant, that they meant the defendant company when they used the term Northern and the pleading alleges that the defendant (naming it formally) issued the covering note for twenty-five thousand dollars of insurance. The reference to the property as the Fairmont Hotel in San Francisco is a sufficiently definite description. No ambiguity arises from the reference to the "Company's General Policy of Insurance." The language used simply served to make the general policy a part of the covering note, and plaintiffs' plead it as such in the complaint. The words "C. O. C."

would be unintelligible to the layman, but such technical terms do not render the writing ambiguous. Technical phrases or symbols or abbreviations are often very clear when interpreted, as they may be, by experts. (Civ. Code, secs. 1644 and 1645.) In this case many expert witnesses testified that the letters meant "in the course of construction" and nothing else, and while two witnesses for the plaintiffs gave to the letters a more extended meaning, the jury, in answer to an interrogatory, found in favor of the interpretation given by the majority of the expert insurance men who testified. Counsel for appellants also asserts that the "thirty day" clause is ambiguous. But it is difficult to imagine anything more crystalline. "Insurance hereunder to cease 30 days from this 19th day of March, 1906, at noon" could only mean that excluding the first and including the last day, the term of the contract would expire on April 18th, at noon. (Civ. Code, sec. 10; Code Civ. Proc., sec. 12.) The words printed across the face of the contract, "This covering memo. must be returned with the application" do not make its meaning in the least obscure. The sentence is merely a direction what shall be done with the "covering note" if an application shall be made for a policy to take its place. To say that these words would convert the writing into a mere application for insurance or that they might reasonably be so interpreted seems to us entirely illogical. The contract was one of *present* insurance. By it the defendant does not merely promise to insure, but by its very terms it "hereby," in the present "secures" the plaintiffs from loss by fire. It has long been established that such a "covering note" is itself a contract of present insurance. (See *Kerr* v. *Union Marine Ins. Co.,* 124 Fed. 837, and cases there cited.) On the instrument in question the word "National" is printed and "25,000" is written immediately thereafter. This does not appear in the body of the contract and could deceive no one. It was due to the failure to strike out the printed word on the original form and to substitute therefor the name of the defendant corporation, but even if that had been done the word and figures would have been merely used by way of index and would have formed no part of the agreement itself. The most serious question, however, arises out of the failure of the "covering note" for $25,000 to specify any rate of premium.

There was testimony on the part of experts that in such a contract there was an implied agreement that if the final and formal policy were not issued the "covering note" would be charged for at the rate of a policy for the same time, the rate to be fixed by the board of underwriters. Temporary contracts of this sort are frequently construed by the courts as implying the customary rates, even when no premium is specified in the "covering note" or "binding slip." (*British American Ins. Co.* v. *Wilson*, 77 Conn. 559, [60 Atl. 294]; *Smith & Wallace Co.* v. *Prussian National Ins. Co.*, 68 N. J. L. 674, [54 Atl. 458]; 2 Clement on Insurance Rule 19, pp. 575–76.)

But counsel for plaintiffs contends that since the court admitted evidence of the conversations between the agents of the parties, the question of the existence or nonexistence of an oral agreement was before the jury and should have been submitted to the jurors under proper instructions; and that the court's refusal to grant defendant's motion for a nonsuit indicated the opinion of the learned judge that the contract of insurance was not a written but an oral one. We do not consider the refusal of the nonsuit in that light. The nonsuit was properly refused because there were certain questions of fact for the jury to determine. For example, the construction of the letters "C. O. C." was a subject of controversy among the experts, at least one of the witnesses for plaintiffs having sworn that those initials involved a promise of continued insurance notwithstanding the distinct limitation expressed in the writing. Under these circumstances it was proper to submit to the jury the question regarding the meaning of those initials as well as the facts and circumstances surrounding the making of the instrument. (*First National Bank* v. *Bowers*, 141 Cal. 259, [74 Pac. 856].)

One of the strongest circumstances against the existence of any asserted oral contract contradictory of the terms of the "covering notes" is found in the conduct of the agent for plaintiffs in seeking to have formal extensions indorsed upon these instruments. If the notes were binding upon the insurance company until the completion of the building, what was the necessity for renewing them? Yet both were sent to Mr. Hunter's office on April 17, 1906. The "covering note" for thirty thousand dollars was renewed, but Mr. Naun-

ton, acting for Mr. Hunter, refused to renew the one for twenty-five thousand dollars issued from Mr. Ahpel's office. It is contended that since Mr. Hunter was the "General Agent" he had no right to refuse a continuance of business which had been secured by his city agent. We see no force in this argument. He might have refused both requests because renewal was not, under the terms of the contract, compulsory upon the company. On the morning of the 18th of April, after the conflagration had started and prior to ordinary office hours, Mr. Sturtevant went to Mr. Ahpel's office, but did not find him there. He did not get the covering note renewed.

Appellants complain of certain instructions to the jury. One of these is attacked upon the ground that it ignores the theory of an oral agreement. It is not seriously contended, that it is erroneous under the theory that the action was based upon the written instrument; therefore we need not discuss it further, for we have already expressed our views on that subject. Complaint is made of the special issues submitted to the jury by the court, and that the court reversed the requirements of section 625 of the Code of Civil Procedure (as it existed at the, time of the trial) by requiring answers to the special issues whether the jury found a general verdict or not. The jury did find a general verdict, however, and we do not see how plaintiffs were injured. It was said in *Plyer* v. *Pacific Portland Cement Co.,* 152 Cal. 132, [92 Pac. 59]: "It is true that the court in giving its direction to the jury should make it plain that they are not required to return findings upon particular questions of fact unless they have agreed upon a general verdict." If the jury had answered the special interrogatories, or some of them, without reaching a general verdict, appellants might complain, but since they apparently did just what the statute prescribes, that is, they found a general verdict and also answered the questions, the error seems to have been harmless.

The court instructed the jury with reference to all but two of the special interrogatories that the answers should be "Yes" or "No." This is assigned as error on the authority of *Plyer* v. *Pacific Portland Cement Co.,* 152 Cal. 132, [92 Pac. 59]. That case does hold that our statute (Code Civ. Proc., sec. 625, as then existing) did not *require* the court to

frame interrogatories which might be answered by single
words of negation or affirmance, but it did not hold that the
court might not narrow the issues in proper cases to questions
answerable by "Yes" or "No." The court, in the interest
of simplicity, should prevent the possibility of long, argu-
mentative and possibly irresponsive answers, and this may
be done sometimes by framing the questions in such way that
the answers shall be "Yes" or "No." In the Plyer case the
chief justice was not denying the court's right to propound
questions which might be best answered by monosyllables, but
he was pointing out the fact that our statute does not limit
the court's discretion to the submission of such questions
only. It is not necessary to review all of the special inter-
rogatories here. They all seem to us to be reasonably appro-
priate to the issues involved and we do not see how the jury
was unduly cramped or prevented from giving a full expres-
sion to the opinion of a majority of its members in the in-
stances where they were required to answer "Yes" or "No."
Take for example the third and fourth questions asked at the
suggestion of defendant:

"Question 3. After the defendant signed said covering
note and delivered it to the plaintiffs did the defendant ever
in writing extend or agree to extend it beyond the 18th
day of April, 1906, at noon? which question you will answer
yes or no.

"Question 4. After the defendant signed said covering
note and delivered it to the plaintiffs did it ever orally extend
or agree to extend it beyond the 18th day of April, 1906, at
noon? which question you will answer yes or no."

These two typical instances illustrate the care with which
the questions were framed to reach, briefly as possible, the
jury's conclusions upon the disputed matters necessarily in-
volved in the trial of the case.

It is the opinion of appellants' learned counsel, however,
that defendant's question No. 9 is in so great conflict with
the general verdict and with question No. 2 of plaintiffs, that
the judgment cannot stand. Said 9th question is as follows:

"Is the intention of the parties as shown by the language
used in that covering note that the defendant insures plain-
tiffs to the extent of $25,000 against loss or damage by fire
to the Fairmont while it is in course of construction, such

insurance to cease on the 18th day of April, 1906, at noon, unless a policy is issued prior to such time?''

To this question the jury returned a negative answer. And ''no'' was the reply given to question No. 2. That question is:

''Was the insurance to the amount of $25,000 sought to be recovered in this action in force at the time of the damage to the Fairmont on April 19th, 1906?''

The position of plaintiffs is that since their construction of the covering note made it extend by its terms to noon on the 19th of April, while that of the defendant would terminate it twenty-four hours sooner, the negative answer to question No. 9 could only mean that the jury accepted their theory and that special issue No. 9 is therefore hopelessly at variance with the rest of the findings and the general verdict. But we do not see that the negative answer to question No. 9 necessarily involves an indorsement of the theory of plaintiffs. In determining this matter we may consider the finding alone and not the evidence or the respective theories of the litigants. (*Chicago etc. Ry. Co.* v. *Dunleavy,* 129 Ill. 148, [22 N. E. 15]; *Higgins* v. *Kendall,* 73 Ind. 527.) While the answer to query No. 9 would demonstrate that the jurors did not agree in every particular with defendant's contentions it might indicate that they believed the end of the contract came at some hour other than noon on the 18th of April, yet long before the dawning of the 19th. The rule in cases of alleged conflict between special findings and a general verdict is very well stated in 38 Cyc. 1928 as follows: ''No presumption will be indulged in favor of answers of the jury to special interrogatories as against the general verdict; but, on the contrary, every reasonable intendment in favor of the general verdict should be indulged, and all parts of the verdict are to be reconciled in support thereof if it can reasonably be done. Hence, the general verdict will stand unless the facts found by the jury in answer to special interrogatories are so clearly antagonistic to it as to be absolutely irreconcilable, the conflict being such as to be beyond the possibility of being removed by any evidence admissible under the issues, so that both the general verdict and special findings cannot stand.'' Measured by this rule we think there is no material conflict of the sort claimed by plaintiffs to ex-

ist. A special finding is inconsistent with the general verdict only when, as a matter of law, the special finding when taken by itself would authorize a judgment different from that which the general verdict will permit. (*Campbell* v. *Dutch,* 36 Ind. 506; *Loewenberg* v. *Rosenthal,* 18 Or. 181, [22 Pac. 601].)

Numerous objections were made to rulings upon the admission of the testimony of experts relating to matters of custom and usage among insurance men, and the meaning of the letters "C. O. C." used in the covering note. Without reviewing these rulings in detail we find that they are all defensible under the provisions of sections 1644, 1645, and 1646 of the Civil Code.

No other alleged errors require notice.

The judgment and order are affirmed.

Henshaw, J., and Lorigan, J., concurred.

Hearing in Bank denied.