[Civ. No. 2963.   Fourth Dist.   Mar. 20, 1942.]

WALTER B. SCOVILLE et al., Appellants v. G. DE BRETTEVILLE et al., Respondents.

Leland J. Allen for Appellants.

Henry G. Bodkin and Charles S. Gass for Respondents.

MARKS, J.—Plaintiffs brought this action to enjoin defendants from interfering with their drilling and production operations in connection with an oil well known as "Treasure No. 8," for an accounting of the receipts from and disbursements made in connection with this well, for judgment for any moneys found due them, and for a receiver pendente lite to take charge of and operate the well.

The receiver was appointed and the order appointing him was stayed by an appropriate appeal bond. The case was tried on its merits and the judgment before us for review was rendered in which the receiver was discharged. An appeal was taken from the order appointing the receiver. That appeal has been decided *post,* p. 633 [123 Pac. (2d) 622].

The trial of the case was protracted and is presented to us in a long typewritten record. The evidence on many questions is conflicting and cannot be harmonized. Under the time honored rule that we must accept as true those portions of the evidence supporting the findings and judgment we will briefly summarize such of that evidence as may be necessary and will not attempt to detail other evidence conflicting with it.

The Treasure Company had oil leases on four parcels of land in the Del Rey Hills in Los Angeles County which are known respectively as the Fletcher lease and the Burns No. 1, No. 2 and No. 3 leases. It had endeavored to drill a well on the Fletcher lease but could not complete the undertaking because of financial difficulties. Negotiations were started with The Adamant Company, through Walter B. Scoville, its representative, looking to its financing the completion of the well. These negotiations resulted in the execution of a written contract, dated April 5, 1938, between the Treasure Company as first party, The Adamant Company as second party, and Walter B. Scoville as third party. The proper construction to be placed on some of its provisions is determinative of the principal issues in this case.

This contract recites the ownership of the various leases by the Treasure Company; that the well on the Fletcher lease had not been completed; that the Fletcher and Burns No. 1 leases were to be combined into one operating lease; that the parties desired to complete the first well and drill a well on

each of the other Burns leases, No. 2 and No. 3, if the first well proved to be sufficiently productive; that The Adamant Company would furnish $10,000.00 for the purpose of carrying this program into effect, subject to its approval by the Commissioner of Corporations.

It was agreed that the Treasure Company would furnish the derrick, machinery, and drilling equipment for the completion of the well, and The Adamant Company would furnish the money. This money was to be deposited in a bank to the credit of the Treasure Company and withdrawn on checks signed by it and J. O. Seeple.

The Adamant Company was to receive a twenty-five per cent participating royalty in the leases, and Walter B. Scoville a participating royalty interest of nineteen per cent in the Fletcher and Burns No. 1 leases if the well were completed for less than one thousand barrels, to be reduced to sixteen and one-half per cent if it should be capable of producing one thousand or more barrels per day upon completion, and eighteen and one-sixth per cent participating royalties in the other two leases. These royalties were to be subject to their pro rata share of all operating and maintenance charges of all wells.

The contract also contained the following provisions:

"When the first well has been drilled to the basement the parties hereto agree to cooperate in obtaining the necessary casing and other completion equipment and material on credit or in connection with production contracts, or otherwise. If necessary, all monies payable on the royalties to be issued to Second and Third Parties, and the interest retained by First Party, after payment of operating expenses, shall be made available to pay for such completion costs. It is agreed, that should Second Party and Third Party decide, after the first well has been drilled to the basement schist, that they do not desire to proceed further, this contract shall then be terminated and they will quitclaim to First Party all of the interests to be received by them hereunder, except one-third (⅓) of their interests in the first well. It is also understood that should the first well be completed for two hundred (200) barrels per day or less, this contract shall terminate, and Second Party and Third Party will thereupon quitclaim to First Party all of their interests hereunder, except as to first well. . . .

"J. Orville Seeple, on behalf of the Second Party and Third Party, and G de Bretteville, on behalf of First Party,

shall form an executive committee to have joint control and advisory powers with respect to all drilling and producing operations hereunder. No purchases shall be made on credit and no expenditures or other obligations incurred without the joint approval of both members of said committee."

This contract was later modified by adding Harry Wynn to the executive committee created in the last quoted paragraph of the contract.

The Corporation Commissioner issued his permit for the issuance of the participating royalties. Deepening the well started in April, 1938, and was continued until about May 28th of that year when it had been drilled to a depth of 6510 feet. Differences arose between the parties over additional financing necessary to bring the well into production. To keep the hole from caving in and the well from blowing out, large quantities of drilling mud and water were pumped into it. The well remained in this condition until November, 1938.

Under date of November 2, 1938, J. Orville Seeple, Walter B. Scoville and The Adamant Company wrote the Treasure Company the following letter:

"The undersigned, for and on behalf of the Adamant Company, Walter B. Scoville, and himself, hereby agrees that Oliver Maze shall be employed as Drilling Superintendent and Tool Pusher in connection with the completion of the Treasure Well, now being drilled on Lot 9, Block 33, Tract 9809, Del Rey Hills, California, and we will assure you the necessary funds will be forthcoming to complete said well."

Work on cleaning out the well and reaming it to receive the casing were started about November 10, 1938, the casing was set several days later, and the other work was done preparatory to a production test. Swabbing started about November 25th, and was continued to December 3rd. The well went on the pump about December 7, 1938. It produced about eighty barrels a day. Up to December 15, 1938, all operations were in charge of plaintiffs or their agents.

The wages of the workmen, due on December 15, 1938, were not paid and defendants took charge of the operations on the afternoon of the following day. According to evidence offered by defendants no objection was made to this change of control until May, 1939.

Under defendants' management the production was increased to an average of about 180 barrels per day. It was not clean oil and required dehydrating before it could be

marketed. The well also produced about 300,000 cubic feet of gas per day from which casinghead gasoline was extracted.

In May, 1939, plaintiffs tried to take physical possession of the well and were resisted by defendants. This action was started on June 1, 1939.

It seems to be the theory of the plaintiffs that the well was capable of producing more than 200 barrels of oil per day; that its production was wrongfully held down by defendants in order to defraud plaintiffs of their right of joint management and their interests in Burns No. 2 and No. 3 leases.

The trial court found that defendants did not forceably take possession of the well; that all the money furnished by plaintiffs was actually used in deepening the well and putting it on production; that all work on the well up to December 16, 1938, was under the control of Harry Wynn and J. O. Seeple; that they did not consult with de Bretteville about such operations and contracted bills without his consent; that many bills were unpaid on December 16, 1938, when de Bretteville took over the management of the well; that none of the plaintiffs objected to his so doing until May 18, 1939; that the operation of said well by defendants was well, efficiently, capably and skillfully done in accordance with good practices in the oil industry; that the well was completed and put on production not later than January 1, 1939, and that the average daily production for thirty days thereafter was less than 200 barrels of oil a day; that "it is not true that at the time said complaint was filed herein that said well was producing more than 200 barrels of oil a day, or as much as 200 barrels of oil per day, and the Court finds that said well was not capable of producing a monthly average of 200 barrels of oil a day for any month during the period of time from the date said well first produced until December 31, 1939, and was at no time capable of producing, nor did it produce more than 200 barrels of oil per day;"

The trial court further found that in November, 1938, the average production of oil was 51.38 barrels per day, in December, about 78.88 barrels a day, and in January, 1939, about 102.3 barrels a day.

There is ample competent evidence in the record to sustain the foregoing findings.

It was further found that "the clause 'be completed for two hundred barrels per day or less' in said contract, means, and did at the time of the execution of said contract mean,

and was intended by all parties to it to mean 200 barrels, or less, of clean oil per day; the Court further finds that said well was not completed for 200 barrels of clean oil per day, but was completed for less than 200 barrels of clean oil per day, and that said contract and addendum thereto insofar as it provided for control or management of said well by plaintiffs, or any of them, or by a committee composed of plaintiffs J. O. Seeple and Harry Wynn, terminated no later than January 31, 1939, and plaintiffs thereby lost their interests in all leaseholds described in said contract other than the leasehold interest described'' on which the first well was located.

It was also found that on some individual days in the months of February, March, April and May, 1939, the well did produce more than 200 barrels of oil per day but that during no month did it produce an average of 200 or more barrels of oil a day; that ''said well and pump were properly operated and controlled so as to produce the maximum amount of oil and gas and that said defendants did nothing in the operation of the said pump, or otherwise, to delay the removal of mud and water or to diminish and retard the production of oil and other hydrocarbons; the Court further finds that the cleaning out of the mud and water from said well was not delayed nor the production of said well retarded or diminished.''

These findings are supported by substantial evidence. Therefore, the only question left open for consideration is the legal effect of these findings in support of the judgment which terminates plaintiffs' interest in the leases (except in Treasure No. 8 well) and plaintiffs' rights of joint management of the leases and that well.

■ Plaintiffs argue that no production test of the well was ever made under the terms of the contract and draw the conclusion that there is no evidence to support the finding that the well was completed for a production of less than 200 barrels of clean oil per day.

The foregoing argument is based on the theory that the only production test that could have been made under the terms of the contract would have to have been made by the three named members of the executive committee, and as no test was made by them there was no proof at all that the well was not capable of producing more than 200 barrels of oil per day; that defendants wrongfully took possession of

the well on December 16, 1938, and should not profit by their own wrong. This argument overlooks the evidence indicating, as found by the trial court, that plaintiffs virtually abandoned the well on December 15, 1938; that without objection from anyone, defendants took possession of the abandoned well on the following day and proceeded to clean it out and put it on production; that the well was skillfully operated and did not produce 200 barrels of oil a day. The contingent rights of plaintiffs depended upon the amount of oil the well produced, and not upon a test by any particular person or persons.

A study of the record supports the inference that plaintiffs were not interested in a well having a small production; that they were disappointed in their efforts to put it on production and with its small production; that as a result they virtually abandoned the project on December 15, 1938, and did not again become interested in it until, through the efforts of defendants, the well was improved so that it produced oil in paying if not large quantities together with wet gas from which gasoline was extracted. Further, the well was skillfully operated by defendants and under the evidence and findings was produced to its maximum capacity. Under these circumstances plaintiffs cannot now complain because the production test was not made by the committee named in the contract.

▪ The trial court admitted evidence as to the meaning given in the oil industry to the expression ''the first well be completed for two hundred (200) barrels per day or less.'' This evidence was to the effect that the expression meant 200 barrels of clean marketable oil produced; that the production of a well is determined by its average daily production of clean oil fit for commercial use over a period of thirty days after it is first put on production; that the expression does not mean emulsified oil and water and does not include gas or casinghead gasoline produced from such gas.

It is rather clear that the expression has a technical meaning given to it by those engaged in the oil industry. This being true, it is settled that the meaning of those words, as used in the contract, was a proper subject for expert testimony. (Sec. 1645, C. C.; *Alta Planing Mill Co.* v. *Garland,* 167 Cal. 179 [138 Pac. 738].) Further, it would be impossible to suppose that ''two hundred (200) barrels per day,'' when used in a contract dealing with the production of an oil well,

could refer to anything other than 200 barrels of oil per day. When used in an oil lease or a contract dealing with oil in the sense here appearing, the terms, when referring to oil, should be held to mean crude petroleum as produced from a well less free water therein, and less water and other foreign substances emulsified in it which render it commercially unfit for market as oil in the state in which it was produced. Certainly the term oil does not include gas or gasoline extracted from such gas unless such special meaning be clearly given it in the contract in question. No such special meaning is given the word in the contract before us.

The trial court correctly received this evidence and was privileged to accept it as true. Plaintiffs cannot add the number of barrels of casinghead gasoline to the number of barrels of oil mixed with water and other impurities in order to reach a production of more than 200 barrels. In view of the evidence and findings their arguments in support of such a method of computing the amount of oil produced daily are untenable.

Plaintiffs further argue that the clause ''Second Party and Third Party will thereupon quitclaim to First Party all their interest hereunder, except as to such first well'' does not include a surrender of their right of joint management and operation of the first well.

It must be conceded that the clause of the contract under consideration is not definite in its terms and required construction by the trial court.

There are two rules of construction that must control here. The first is set forth in *Smith* v. *Carlston,* 205 Cal. 541 [271 Pac. 1091] at page 550, as follows:

''When clauses in a written agreement between parties, doubtful in meaning, are to be construed, it is a cardinal rule of interpretation that the entire agreement must be looked to for light in determining the meaning to be given to the particular clause thereof under scrutiny (6 Cal. Jur. 258, sec. 16, and cases cited), and a not less important rule for the guidance of courts in determining the intent of parties in the insertion of particular clauses in their written agreements is that the circumstances and relations of the parties at the time of the execution of their agreements and of the insertion of particular clauses therein shall be carefully considered in aid of such interpretation. (Civ. Code, sec. 1647.)'' (See, also, *Lemm* v. *Stillwater Land & Cattle Co.,* 217 Cal. 474 [19 Pac. (2d) 785].)

The second rule is set forth in *Tide Water Assoc. Oil Co.* v. *Curtin*, 41 Cal. App. (2d) 884 [107 Pac. (2d) 945], at pages 895, 896, as follows:

". . . it cannot be said that the two instruments, considered in the light of the facts, are not susceptible of the interpretation placed upon them by the court. Hence, we cannot disturb the decision. It was the province of the trial court to resolve doubtful language in the lease and to determine the meaning and effect of the subsequent agreement. (*Adams* v. *Petroleum Midway Co., Ltd., supra* [205 Cal. 221, 270 Pac. 668].)

"When the construction given an instrument by the trial court appears to be reasonable and consistent with the intent of the parties making it, courts of appellate jurisdiction will not substitute another interpretation even though it seems equally tenable. (*Berdan* v. *Berdan*, 39 Cal. App. (2d) 478 [103 Pac. (2d) 622].)"

When we apply these rules to the facts before us we can not disturb the construction placed on the contract by the trial court. It rather clearly appears from the evidence that at the time the contract was executed the plaintiffs would not be interested in continuing with the contract unless the well was a good producer. They described a well producing a thousand barrels of oil or more a day as coming within that class and as coming within their hopes and expectations although they placed their minimum at a production of more than 200 barrels a day in the contract. They virtually abandoned the well when their efforts resulted in a small production. These facts, and others in the record, indicate that plaintiffs construed the contract to mean that their rights of management, not only of the Burns No. 2 and No. 3 leases, but of the first well, ended upon it appearing that the well produced less than 200 barrels of oil a day. As the construction placed by the trial court on the contract is reasonable and seems to be in accordance with the intent of the parties when it was executed and with the construction placed upon it by their subsequent actions we cannot disturb that construction here.

Plaintiffs complain of many of the items appearing in the accounting which were approved by the trial court.

The record discloses that under a stipulation of the parties the trial court appointed Eugene M. Berger, a certified public accountant, to audit the books of defendants and to ren-

der an account to the court. When this account was submitted, plaintiffs, being dissatisfied, employed their own accountant who prepared another account. Five days were consumed in taking evidence on this phase of the case. Certain of the more controversial items were reserved for future consideration and decision under stipulations made in open court. Other items were modified and as so modified were approved in the findings which went into very considerable detail concerning them.

Without reviewing in detail the very considerable and somewhat conflicting evidence offered on this phase of the case it should be sufficient to state that there was very substantial evidence supporting the conclusion reached by the trial judge. This being true the findings and judgment on these questions become final here under the familiar rule that conflicts in the evidence are addressed to and settled by the trier of fact and that a judgment may not be reversed on appeal because of conflicts in the evidence.

Plaintiffs complain of the portion of the judgment discharging the receiver who was appointed on July 19, 1939. The order appointing the receiver was stayed, pending appeal, by an appropriate bond so that the receiver never acted.

As plaintiffs have no right of management of the undertaking, and as there is no indication that they will not receive their participating royalties from the net production of the completed oil well, and because the controversies between the parties have been settled and no good reason for a receiver appears, the order discharging the receiver was proper and must be affirmed.

It is unnecessary to consider the other questions argued by counsel.

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 18, 1942.