[Civ. No. 3101. Fourth Dist. Feb. 16, 1944.]

J. W. ISENBERG et al., as Administrators, etc. et al., Appellants, v. E. C. SALYER, Respondent.

Leland S. Bower for Appellants.

Sidney J. W. Sharp and M. Wingrove for Respondent.

GRIFFIN, J.—This is an action for unlawful detainer based upon a written lease between W. D. Isenberg, now de-

ceased, and Land Mortgage Corporation (W. D. Isenberg, president), as lessors, and defendant E. C. Salyer, as lessee. The lease covered 380 acres of farm land in the Tulare Lake basin. Defendant, in his answer, admitted the making of the lease but denied it was for a term of three years commencing on October 1, 1937, and alleged that on the contrary, the lease was for a term which would permit him to produce and harvest on the leased premises three annual crops of wheat or barley. He admitted his possession of the premises and that he refused to surrender possession thereof to plaintiffs. He further alleged, as a separate answer and affirmative defense, that the leased premises were entirely flooded by waters of the lake in the spring of 1937, and were still partially flooded at the time the lease was made and entered into; that it was understood between the parties, and that the lease provided, that the term of the lease would be such period as would permit respondent to grow and produce on and harvest from the premises three annual grain crops. A copy of the lease was attached to and made a part of the answer. It was further alleged therein that the leased premises, during practically the entire time since the lease was made, have been and still are flooded by the waters of the lake; that although he planted a portion of the premises to crops in the fall of 1937, and planted all of the premises to crops in the fall of 1940, both of said crops were subsequently flooded and destroyed and were wholly lost to him, and that he was never able to grow or harvest any crops from the leased premises; that he fully performed and complied with the lease and that it was still in force and effect and would be until such time as he can grow and produce annual grain crops.

The trial court, in construing the lease, admitted the evidence showing the facts and circumstances surrounding the making of it and the negotiations of the parties in connection therewith for the purpose of explaining the language used in the lease and interpreting what the parties intended thereby. It then found in favor of defendant on the issues presented and denied plaintiffs' prayer for relief.

The material portions of the lease may be thus summarized: October 1, 1937, lessors leased jointly to lessee the land described. By its terms lessee agrees to pay to lessors "by way of advance rental for the year beginning on Oct. first, 1937,

and ending on October 1st, 1938, the sum of $760, receipt of which is hereby acknowledged, which is to be refunded by the lessors to the lessee, out of the first crops produced upon the same being harvested and sold. And the sum of $380 cash advance rental for the second year, and the sum of $380 cash advance rental for the third year, which is refunded respectively at harvest time of the second and third crops produced thereon, upon same being harvested and sold . . . The annual rental shall be one-third of all crops produced thereon, if the crop is produced without the necessity of irrigation, and during those seasons that irrigation of the land is necessary to produce a crop thereon, the annual rental shall be one-fourth of all crops produced . . . and delivered to the lessors . . . that lessee shall use his best efforts to protect the land herein leased against further inundation by the construction of such levees as are feasible and practicable . . . Lessee promises . . . to enter on said premises, take possession thereof, and at the proper season and in a good and farmerlike manner properly prepare said premises for planting, and to plant all of said premises to crops of wheat or barley; . . . Lessee promises . . . that he will at the proper season, cause to be harvested . . . all crops of wheat or barley and will deliver to lessors'' their share; ''that if, during the term of this lease herein provided, lessors effect a bona fide sale of said premises and such sale shall be made during the first year of this lease, that is between date hereof and October 1, 1938, then lessee will, upon written notice, surrender possession of said premises . . . on the first day of October, 1938 . . . provided . . . that lessors reimburse lessee for the reasonable cost and expense of . . . work he has done in preparing said premises for planting during the second year of this lease, and for any advance rents which lessee has not had an opportunity to recover; . . . that if said premises should be sold during any year of this lease lessee will . . . surrender possession . . . on October 1st following such notice, and this lease shall end'' subject to surrender conditions not here material. ''Time is the essence of this lease and of each and every covenant and condition thereof.''

In construing an agreement it is the general rule that although the agreement of the parties be reduced to writing, if there be a latent ambiguity therein or if the language of

the writing will admit of more than one interpretation, or if the intention of the parties is left in doubt from a reading of the document, parol evidence of the circumstances and of the situation of the parties may be considered in order to ascertain their true intention; and in this manner an issue of fact may be presented to the trial court for its determination.

To ascertain the intent of the parties in entering into a contract or agreement, in a case where that intent upon the face of the instrument is doubtful, or the language used by them will admit of more than one interpretation, the court will look at the situation and motives of the parties making the contract or agreement, its subject matter, and the object to be attained by it, and will allow these circumstances to be shown by parole evidence notwithstanding the contract itself is in writing. (*Shelley* v. *Byers*, 73 Cal.App. 44 [238 P. 177]; *Weaver* v. *Grunbaum*, 31 Cal.App.2d 42 [87 P.2d 406]; *Eastman* v. *Piper*, 68 Cal.App. 554 [229 P. 1002]; *Henika* v. *Lange*, 55 Cal.App. 336 [203 P. 798]; *Balfour* v. *Fresno Canal & Irrigation Co.*, 109 Cal. 221 [41 P. 876].)

Plaintiffs do not dispute this rule but contend that the lease is not susceptible of more than one interpretation, and that as signed and executed the term of the lease was for a fixed period of three years and no more, and that their objection to the admissibility of parole evidence bearing on the surrounding circumstances and intent of the parties should have been sustained. This is the main question here involved.

The evidence surrounding the execution of the lease, if admissible, fully supports the court's conclusion that the lease was not intended as a lease for a definite term of three years. Defendant Salyer testified that he and a former partner had leased Isenberg's land in 1933 and 1934; that during those seasons they farmed the land and paid a cash rental of $1 per acre; that the partnership dissolved and his partner leased the same land in 1936 at the same rental; that in August, 1937, Salyer went to Los Angeles to see the owner, W. D. Isenberg, who was a retired attorney at law and lived in that city, and informed him that he was interested in leasing the lands and that they discussed both a cash rental and a crop rental with cash advance payments; that they discussed the possibility of the lake flooding the lands and that they both knew the lands were under water from 1915 to 1919; that although crops had been planted, none had

been harvested during that period; that the land was flooded again in 1922 and 1923; that some years the land was too dry to farm without irrigation; and that at the time of their meeting in August, 1937, the land was under water. He testified that Isenberg stated that he thought defendant would be able to get a crop in three or four years. He then testified that at a later meeting they "discussed the lease and different phases of consummating a lease and we arrived at this idea of paying him $2 an acre the first year and a dollar an acre the second year, and a dollar the third year, and in return for that we was to get a lease that would give us the opportunity to harvest three crops"; that as to the rent payments, instead of running over a period of more than three years, the lease would be drawn so "we could stop it when we made three payments." Defendant then left a deposit of $380 with Isenberg who refused to sign a lease that had been prepared by Salyer's secretary. Isenberg insisted on drawing his own lease and then agreed to go and look at the property. At a later date he visited the property, endeavored to contact Salyer who was away at the time, but discussed with his secretary the terms of the lease. He then dictated the lease as prepared. The secretary testified, over objections, that Isenberg was dictating the lease to her and at the time each was endeavoring to so word the lease that its term would "cover three crops and not three years"; that the written lease which he then signed, after considerable discussion of the intentions of the parties, was the one offered in evidence and was the one which was left with her for Salyer's signature; that she related the above conversation had with Isenberg to Salyer when he returned home; that he subsequently took the lease to Los Angeles and signed it; that Isenberg and he agreed "that we was to make it $2 the first year, $1 an acre for two more payments, and we was to have three, we was to be able to harvest three crops, harvest and sell, from that land, to get our money, advance rent and the crops off of them."

Salyer then testified that in October, 1937, he entered into possession of the premises, expended $6,646, which included cost of building levees, seeding, plowing and rental for three years, and that his only return therefrom was a check for $646.45, which was for two years' parity payments from the government.

As W. D. Isenberg died shortly after the execution of the lease, no evidence was available to rebut the above-mentioned conversation admitted over objections. Plaintiffs rested and relied upon the strict interpretation of the lease.

▆ We will therefore consider the terms of the lease to determine whether they come within the exception to the rule that where a contract is reduced to writing there can be, as between the parties, no evidence of the terms of the agreement other than the contents of the writing. (Secs. 1856 and 1860, Code Civ. Proc.) In the first place, the lease fails to provide any definite term for which 'it should run. It is dated as of October 1, 1937, and provides that lessors hereby lease to lessees the property described; that the lessee agrees to and did pay $760 advance rental for the year beginning October 1, 1938, which amount "is to be refunded . . . out of the first crops *produced* upon the same being harvested and sold." (Italics ours.) It fixes no year when that first crop must be produced. There appears to be no limitation on that subject. If a first crop were not, therefore, produced until the third or fourth year, lessee, under the terms of the written lease as set forth, might be entitled to remain in possession of the property until such first crop was *produced*. The same argument and interpretation would apply as to the cash advance rental for the second and third year, which rental was to be refunded "respectively at *harvest time* of the second and third *crops produced* thereon." (Italics ours.) Again, there is no particular year specified or term fixed within which such second or third crop must be produced or harvested. It therefore clearly appears that the intention of the parties as to the term of the lease is left in doubt from a mere reading of the lease itself. Parole evidence was therefore admissible to ascertain the true intention of the parties and an issue of fact was therefore presented to the trial court for its determination. ▆ It cannot be said that the lease, considered in the light of the evidence, is not susceptible of the interpretation placed upon it by the court. Hence, we cannot disturb the decision. It was the province of the trial court to resolve doubtful language in the lease and to determine the meaning and effect of it. When the construction given an instrument by the trial court appears to be reasonable and consistent with the intent of the parties making it, courts of appellate jurisdiction will not

substitute another interpretation even though it seems equally tenable. (*Scoville* v. *de Bretteville,* 50 Cal.App.2d 622 [123 P.2d 616]; *Tide Water Associated Oil Co.* v. *Curtin,* 41 Cal. App.2d 884, 895 [107 P.2d 945]; *Asamen* v. *Thompson,* 55 Cal.App.2d 661, 670 [131 P.2d 841]; *Tillis* v. *Western Fruit Growers, Inc.,* 44 Cal.App.2d 826, 831 [113 P.2d 267]; *Hayward Lumber etc. Co.* v. *American National Bank,* 50 Cal. App.2d 247, 254 [123 P.2d 56].) The evidence supports the court's findings.

Judgment affirmed.

Barnard, P. J., and Marks, J., concurred.