[Civ. No. 23250.   Second Dist., Div. Two.   Feb. 18, 1959.]

SHARON ELIZABETH GILLETT, a Minor, etc., Respondent, v. JOSEPHINE I. GILLETT, Appellant.

Robert H. Sanders and Warner, Peracca & Cowan for Appellant.

George H. Pratt for Respondent.

ASHBURN, J.—Appeal from judgment for $50,000 awarded for injuries received by 8-year-old plaintiff through excessive punishment by her stepmother, the defendant.

Defendant stood *in loco parentis* and was entitled to the same immunity which would attend a natural parent, but no greater (*Trudell* v. *Leatherby*, 212 Cal. 678, 682 [300 P. 7]). It is now established as California law that, while a parent is not liable to his child for the results of negligence, he has no immunity with respect to willful torts; that he may administer reasonable punishment with impunity, but when he exceeds that limit and does so willfully he commits a battery and is civilly liable for the consequences; the questions of excessiveness and willfulness are issues of fact for trial judge or jury to solve.

*Emery* v. *Emery*, 45 Cal.2d 421 [289 P.2d 218], upholds the right of a child to recover from her father for willful misconduct resulting in an accident and injuries to her. After pointing out that "[t]he parent's immunity, if any, from tort liability is based on the minor child's disability to sue rather than on the absence of a violated duty" (p. 427), the court said at page 429: "The rationale of the cases refusing to extend immunity to the parent for wilful or malicious torts against his minor children is that the lack of such immunity does not conflict with or inhibit reasonable parental discipline. [Citations.] Preservation of the parent's right to discipline his minor children has been the basic policy behind the rule of parental immunity from tort liability. [Citation.] Since the law imposes on the parent a duty to rear and discipline his child and confers the right to prescribe a course of reasonable conduct for its development, the parent has a wide discretion in the performance of his parental functions,

but that discretion does not include the right wilfully to inflict personal injuries beyond the limits of reasonable parental discipline. No sound public policy would be subserved by extending it beyond those limits. While it may seem repugnant to allow a minor to sue his parent, we think it more repugnant to leave a minor child without redress for the damage he has suffered by reason of his parent's wilful or malicious misconduct. ▮ A child, like every other individual, has a right to freedom from such injury. Accordingly, we conclude that an unemancipated minor may sue his parent for a wilful or malicious tort, and thus that Buel is not immune from suit for the causes of action pleaded by Barbara and Joyce in the complaint in the present action.'' *Perkins* v. *Robertson,* 140 Cal.App.2d 536 [295 P.2d 972], relying upon the Emery case, holds that such an action will lie for willful misconduct of a stepfather. This was also an automobile accident case; but that is not a limiting circumstance. The rule applies to any type of willful wrong to the child. Indeed the infliction upon a child of ''cruel or inhuman punishment or injury resulting in a traumatic condition'' is a felony. (Pen. Code, § 273d.) And such excessive punishment, when found to be a willful wrong, amounts to a battery (*Wright* v. *Wright,* 85 Ga.App. 721 [70 S.E.2d 152, 154]). The complaint charges and the court found in terms of assault and battery; it was also found that defendant was not actuated by express malice. But the terms assault and battery when used with respect to this case imply willfulness.

▮ Plaintiff Sharon and her older sister Inette were doing the supper dishes; plaintiff was drying; she dropped a dish and it broke; defendant came in from the yard and, according to Inette, got very upset, started yelling and screaming and swearing at Sharon, hit her in the back with her doubled fists; Sharon ran into the bedroom and defendant followed, hitting her on the way and in the bedroom; at that place Sharon was between two beds with her face to the wall, crying and screaming, and defendant kept hitting her in the back with her doubled fists, sideways. This was in the early evening of June 15, 1953. The father returned from a fishing trip about midnight. At that time Sharon was moaning and groaning, pale and very upset. He did not sleep any that night. However he did not learn of the beating until three or four days later when Sharon's own mother told him about it. At his suggestion defendant took plaintiff to the family doctor the next day after the assault, the 16th.

The doctor was plaintiff's great-uncle, Dr. Claude S. Gillett.

106

Defendant told him the child had been vomiting from 1 a. m. to 6 :45 a. m. and that her father had punished her a few days before. The doctor saw no external evidence of trauma. With a history of vomiting and pain in the abdomen, radiating to the back, he sent the child home and told defendant to watch her.

That evening he was called to the house and found plaintiff pale and ill, in mild shock, with evidence of internal bleeding. She was taken to the hospital and Dr. Robbins, a surgeon, was called in. The two doctors made a preoperative diagnosis of blood in the abdomen, the most common cause in children being a ruptured spleen; they thought that was probable in this case. An exploratory operation was performed and it was found that the splenic and renal (kidney) veins were ruptured and bleeding into the abdominal cavity. In Dr. Gillett's opinion (he was called by the defendant) the ruptures were caused by some injury from outside the body, certainly not from internal injury or disease; the veins could not be repaired, because of bruising and tearing; plaintiff's life was in jeopardy; the supply of return blood had been ruined, and it was necessary to remove the spleen and kidney to prevent her bleeding to death.

Dr. Chas. R. Parrish, who testified from the hospital record which had been received in evidence by stipulation, interpreted the doctors' entries for the court and said they showed rupture of spleen and kidney (rather than the veins leading to same); this seems to have grown out of use of the word "view" in the postoperative diagnosis; Dr. Gillett says the word should have been "vein." Dr. Parrish also said a substantial blow would be necessary to cause such ruptures; that a fist could do it and not necessarily leave external evidence of trauma; more than half of such ruptures show no external bruising. The kidneys and spleen are below the rib cage and are protected by muscular tissue. Plaintiff was in the hospital about two weeks and made good recovery.

Both doctors testified that little is known about the functions of the spleen or the effect of its removal. They also agreed that the removal of a kidney from a female child impairs her capacity for successful pregnancy due to the overload of work upon the one remaining kidney.

That the limit of reasonable punishment was passed in this instance and that defendant's violence was willful admits of little debate; certainly the trial judge was warranted in so concluding. Proximate cause is clear also. Defendant denied the whole punishment incident and said the father had beaten

plaintiff with a belt and buckle about a week before, but the court accepted the evidence which sustains the inferences above set forth. These considerations dispose of appellant's contention that she was entitled to judgment as a matter of law upon the theory of parental immunity.

Appellant contends that the court erred in permitting Dr. Parrish, over objection, to testify from the hospital record under the guise of merely interpreting it. The claim is that an expert can testify only in response to hypothetical questions. This witness interpreted the records made by the doctors in the hospital and, because of the technical terms involved, there could be no error in this. (See *Law* v. *Northern Assurance Co.*, 165 Cal. 394, 402 [132 P. 590]; *Alta Planing Mill Co.* v. *Garland*, 167 Cal. 179, 183 [138 P. 738]; *Scoville* v. *de Bretteville*, 50 Cal.App.2d 622, 629 [123 P.2d 616]; *Manos* v. *James*, 7 Wn.2d 695 [110 P.2d 887, 893-894]; *Christiansen* v. *Hollings*, 44 Cal.App.2d 332, 347 [112 P.2d 723]; *Howland* v. *Oakland C. St. Ry. Co.*, 110 Cal. 513, 518-519 [42 P. 983]; 82 A.L.R. 1460, Anno.) *People* v. *Le Doux*, 155 Cal. 535, 554 [102 P. 517], upon which appellant relies is not to the contrary. In that case certain physicians, called as expert witnesses, were asked: " 'Now, doctor, assuming each and all of the facts and circumstances testified to by these gentlemen I have named as true, what in your opinion was the cause of the death of A. N. McVicar, the deceased person mentioned in this case?' " It was held that objection thereto was improperly overruled, the court saying in part: "The best way to obtain the opinion of an expert witness upon a matter which is the subject of expert evidence, is through the medium of a hypothetical question. Unsatisfactory as that method unquestionably is, it is the least objectionable known to the law." But the court added, at page 555: "In thus pointing out what we conceive to be the best method for obtaining the expert opinion of a witness, we would not be understood as saying that every departure from that method involves error, necessitating the reversal of a case. Cases may arise where the facts upon which the opinion is sought are simple, salient, and few. If it be made to appear that the expert has heard the testimony by which those facts have been presented, it would not necessarily be held ground for reversal that he was asked to express his opinion upon those facts, without a restatement of them."

Dr. Parrish, in the case at bar, initially explained the meaning of the entries made in the hospital record in terms

which are not familiar to the layman. He was then led by both sides into testifying as to causes and effects of conditions that he found or thought he found disclosed by the record. In that we see no error. If he did misinterpret the doctors' diagnoses, no prejudice ensued; the trial was not before a jury; and defendant's own witness (the only other expert) testified that rupture of the mere veins leading to the spleen and kidney would have caused her death had those organs not been removed. The rupture of the organ itself could not be more serious.

Dr. Robbins, who performed the operation (assisted by Dr. Gillett), was not called by either side. It does not appear that he was not equally available to them. No presumption arises from plaintiff's failure to call him. (*Gibson v. Kennedy Extension G. Min. Co.*, 172 Cal. 294, 305 [156 P. 56]; 20 Am.Jur. § 189, p. 193.)

After defense counsel had used plaintiff's deposition by way of impeachment and to his entire satisfaction, and after the evidence was closed, he offered the whole document in evidence. The court declined to receive it. There was no error in this. Under like circumstances this court said in *Stafford-Lewis* v. *Wain*, 128 Cal.App.2d 614, 627 [276 P.2d 157]: "Plaintiff complains of the exclusion from evidence of the depositions of defendants and the failure of the court to consider the depositions of Wain and Rosenus. Although the depositions had been filed earlier and portions had been used for impeachment purposes, they were not actually offered in evidence until during the course of the closing argument on behalf of plaintiff. The admission of the depositions at this point would have required the court to reopen the case; would have necessitated reading the depositions into the record; and the consequent determination by the court of the admissibility of such portion of the depositions as to which objections had been made when they were taken and would possibly have occasioned the introduction of further evidence and further argument on behalf of defendants. Because of the lateness of the offer the court did not abuse its discretion in refusing to admit the depositions in evidence."

Finally appellant argues that an award of $50,000 (the full amount of compensatory damages for which plaintiff prayed) is excessive as matter of law. Dr. Gillett testified that plaintiff always appeared to him to be a delicate child, that he felt she had a speech impediment and might be a mild spastic; she did not handle herself as well as an ordinary child. He also said: "The spleen, while its functions may be important

they are certainly not absolutely essential. And while it is a sad thing for any of us to lose our kidneys, that is the one organ that is taken over—the function is taken over completely by the other organ." Dr. Parrish: "Doctor, would you tell the Court, please, what the probable effect on the health of the patient is of the removal of one kidney and a spleen? A. That may influence the patient's future well-being more or less. In the case of a woman one kidney could give complications later in life during pregnancies because the kidneys are burdened during pregnancies even with two kidneys. As to the effect of the spleen I don't think too much is known yet, what the effect of the removal of the spleen is. Q. Would you say that a young female would be less likely to have a successful pregnancy after having one kidney removed than if she had not had it removed? A. I think so." This rules the spleen out as a basis for substantial damages. But the probable adverse effects of removal of a kidney warrant a substantial award. However, $50,000 is patently too high. We have come to the conclusion that this judgment is excessive as a matter of law and should be reduced to $30,000.

It is ordered that if plaintiff within 20 days from the filing hereof files with the clerk of this court a written consent to a modification of the judgment by a deduction therefrom of the sum of $20,000, leaving the judgment to stand for $30,000 and costs of suit, said judgment be modified accordingly, same to bear interest at the legal rate from the date of entry of the original judgment in the superior court; but if such consent be not so filed within said time the judgment shall stand reversed hereby.

Fox, P. J., and Herndon, J., concurred.

On February 25, 1959, the following order was filed:

THE COURT.—Plaintiff and respondent having filed herein on February 25, 1959, her written consent thereto, pursuant to the decision of this court filed February 18, 1959, it is hereby ordered that the judgment herein be modified by deducting therefrom the sum of $20,000, leaving the judgment to stand for $30,000 and costs of suit, such modified judgment to bear interest at the legal rate from the date of entry of the original judgment in the superior court, and as so modified the judgment is affirmed. Each party to bear own costs on appeal.

Appellant's petition for a hearing by the Supreme Court was denied April 22, 1959.