## Continental Insurance Company of New York v. Baker.

(Decided March 27, 1931.)

GORDON & LAURENT, T. M. GALPHIN, JR., and C. H. LISMAN for appellant.

RAYBURN & WITHERS for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON— Reversing.

This is an action to recover on an alleged oral contract of insurance. · On December 17, 1928, A. F. Baker was the owner of a certain dwelling, outbuildings, and personal property, located about 1½ miles north of Providence, Webster county, Ky. At that time Vaughn & Melton, who resided at Dixon, Webster county, were agents of the Continental Insurance Company. Baker at the time was residing at Providence. The dwelling was not occupied by any one, though the appellee had at the time a part of his household and kitchen furniture stored in it. Prior to December 17, 1928, he telephoned Melton, of the firm of Melton and Vaughn, and informed him that he desired fire insurance on the dwelling above referred to. Within a few days thereafter, both Vaughn and Melton went to Baker's place in the country with the view of writing insurance on his buildings. Baker was not immediately present when they arrived. They looked about and made a diagram of the dwelling and outbuildings. Baker returned while they were there. He and they had a conversation about the insurance on the property, out of which this litigation arises. Baker moved into the dwelling before January 1, 1929. It and its contents were destroyed by fire on the 15th day of February, 1929. In March, 1929, Baker filed this action, alleging that he entered into an oral contract with the Continental Insurance Company of New York; by and through its agents, Vaughn & Melton, by which it agreed to, and did, insure this property. The usual allegations in such cases were alleged in the petition.

He avers that he signed and delivered to Vaughn & Melton an application on the 17th day of December, 1928, for the insurance to become effective January 1, 1929; that he executed his promissory note amounting to $144.72 for the installment premiums due for 1930, 1931, 1932, 1933; that Vaughn & Melton themselves agreed to assume for him payment of the premium of $36.18 for

1929, and to pay it to the company for him, with the understanding and agreement, then and there made between him and them, that he would pay it to them; that the insurance was to cover loss by fire on the buildings and its contents from January 1, 1929, to January 1, 1934.

An answer was filed by the appellant traversing the petition. Other pleadings were filed, which from our view of the case it is not necessary to consider. The issues raised by the pleadings were tried by a jury. It returned a verdict in favor of plaintiff, on which a judgment was rendered for $2,206, with interest from the 20th day of April, 1929, and costs, from which this appeal is taken.

At the conclusion of appellee's evidence, the appellant asked the court to give to the jury an instruction directing a verdict for it. The court reserved its ruling until the conclusion of all the evidence in the case. At the close of testimony offered by both parties, again the appellant requested a peremptory instruction. The court refused to give it to the jury.

It is insisted that the evidence fails to establish the entering into and the making of the contract set out in the petition. This question must be determined by the evidence. Inasmuch as its right to a peremptory instruction depends entirely on the sufficiency of the evidence, to bring the case within the scintilla rule and in order to be exact in a statement of the evidence, we prefer to give it in the language of the witnesses, in so far as it relates to this issue:

The appellant was asked and answered in part, as follows:

"Q. What was said relative at the time, was anything said as to whether or not you were to have any insurance, and if so, when it would become effective? A. Yes there was.

"Q. Relate that Conversation. A. Well, I went ahead and says to them, I says, 'Do you fellows have to have the first premium down on this?' and they said, 'Well, we are supposed to.' I said, 'Well, I can't take out no insurance now, I haven't got the money.' I says, 'I will just wait and talk to Mr. Vaughn at Clay, about it'. They commenced then about this here company that Mr. Vaughn repre-

sented at Clay being a young company. . . . So I said, 'Well, I haven't got the money now.' They asked me when I could have it, and I said in two, or three or four weeks. Then they asked me when I was aiming to move back out there, and I told them I was aiming to be there by January 1st. I said, 'I would move next week, if it wasn't Christmas week.' They said, 'Well, we can take care of you.' They said, 'You say you will pay it in two or three or four weeks?' And I said, 'Yes.' And then Mr. Melton says to Mr. Vaughn, 'Well, what do you say about that, a vacant house?' And I said, 'This house is not vacant, I have more dollars worth of stuff stored away out there than I have here.' They said, 'Oh well, we will take care of you on that.' Mr. Vaughn then said. 'Well, it would be something like that time by the time the policy gets back. . . .' They was to take care of me on this policy business, the first premiums for two or three or four weeks. I went ahead and traded, and he wrote up the application and I signed the application and signed those notes. Then they asked me again if I would be there by the first of January, and I said, 'I sure will and if anything happens in sickness or anything like that I will call you.' I says, 'But I am going to be there by January 1st.' And they said, 'All right, your policy will be in full force January 1st, we will see to that.'

"Q. Then you delivered the application and notes to them? A. Yes, Mr. Melton stood right there and turned the application and notes and showed me where to sign them. . . . .

"Q. You didn't pay them the premium after two or three or four weeks did you? A. I didn't see them anymore. . . .

"Q. You expected your insurance to be in force after the two or three or four weeks as you say, from December 17th even though you didn't pay the premium? A. I was expecting them there to bring some sort of policy and collect the premium.

"Q. You had expected a written policy? A. Some kind of a policy.

"Q. You weren't going to pay them for that insurance until they brought you a written policy, was that right? A. I never meant anything about when I would pay them.

"Q. Was that the reason you didn't pay them? A. No, the mines was running every day and the weather was bad.

"Q. You said awhile ago that you expected them to bring you some kind of a policy and then you would pay them. A. I expected to pay them in two or three or four weeks.

"Q. You didn't pay them in two or three or four weeks? A. No I didn't. I didn't see them. . .

"Q. You knew they were supposed to get the first premium in cash? A. I figured it was cash. I had the money for them there.

"Q. . . .

"Q. You expected them to issue you a written farm policy didn't you, the regular standard farm policy? A. Mr. Vaughn just told me it will that time by the time we get the policy back.

"Q. I asked you this, didn't you expect the campany to issue you a policy, to issue you a regular farm policy for this community? A. I thought probably they would, yes. . . .

"Q. How much longer after the two or three or four weeks did you expect them to take care of you until the end of the five years? A. I thought they would come and get their money for the first premium."

The appellee's daughter testified in his behalf as follows:

"Q. State to the jury what you heard. A. My father said he didn't have the money right at the time to pay the first premium but said he would have it two or three or four weeks and they said that would be all right. Then they talked among themselves about the house being vacant and my father said he had more furniture out there than he had in town and that he would be out there by January 1st, and all of it would be out there, and they said that would be all right. . . .

"Q. Did you hear Mr. Melton and Mr. Vaughn, either one of these gentlemen tell your father that they would have to send this application off to the company? A. I heard them say it would come back."

The parties, by counsel, recognize the general rule that oral contracts of fire insurance are enforceable. It has been so stated and applied many times by this court. Hartford Fire Ins. Co. v. Trimble, 117 Ky. 583, 78 S. W. 462, 25 Ky. Law Rep. 1497; Springfield Fire & Marine Ins. Co. v. Snowden, 173 Ky. 664, 191 S. W. 439; Georgia Casualty Co. v. Bond-Foley Lumber Co., 187 Ky. 511, 219 S. W. 442; Brown v. Home Ins. Co., 203 Ky. 715, 262 S. W. 1088; Kitchen v. Yorkshire Ins. Co., 226 Ky. 376, 10 S. W. (2d) 1074. But, before such contract will be enforced, every essential element to constitute a valid contract must be alleged and proved by the one who seeks to enforce it. These indispensable elements are (1) the subject-matter; (2) the risk insured against; (3) the rate of premium paid or agreed to be paid; (4) the duration of the risk; (5) the amount of insurance; and (6) the identity of the parties. The minds of the parties must meet as to each of these essentials. One of the most essential elements of such a contract is that there actually be an agreement between the parties. King v. Ohio Valley Fire & Marine Ins. Co., 212 Ky. 770, 280 S. W. 127; Cyc. of Ins. Law (Couch) vol. 1, sec. 77, p. 123.

The contract set forth in the appellee's pleading and shown by the evidence is that the oral contract was to take effect January 1, 1929. He does not allege, nor does he attempt to state, that he made a contract with the agents of appellant for temporary insurance to protect him against loss by fire until the written policy should be delivered to him according to the terms of the written application which he signed and delivered at the time. Nor is it claimed by him that the contract of insurance to take effect January 1, 1929, and to continue for a period of five years, was intended by him and the agents to be evidenced solely by an oral contract. It is perfectly apparent from his testimony and that of his daughter that he expected a written policy of insurance to cover his property during that period. It is apparent that he signed the written application for the insurance and executed his note for the premiums for the last four years of the period of five years. He intended to pay cash, and the agents of the company expected to collect the first premium, in cash, if and when the written policy was delivered to him.

A contract of insurance ordinarily is fully made when the application is signed and delivered by the in-

sured and accepted at the time by the agent of the company, unless there is an agreement to the contrary, which may be in parol. Springfield Fire & Marine Ins. Co. v. Snowden, supra. Reliance is had in this case exclusively on the parol contract with the agents, and recovery is not sought on a written policy. Nor is it claimed that he paid the premium for the first year or that he executed a note for it. To excuse himself for the nonpayment of the $36.18, the premium for the year beginning January 1, 1929, and ending January 1, 1930, he, in his petition, alleges:

> "They agreed to assume the payment themselves (of the first premium) and to pay the company therefor with the understanding and agreement that this plaintiff would repay them therefor. Said contract of insurance was to run for a period of five years from the first day of January 1929, and was to cover any and all loss to any property above described that might be destroyed by fire between the said first day of January 1929, and the first day of January, 1934; . . . that its agents agreed with this plaintiff that said insurance should become effective on the 1st day of January 1929, all of which was for and in consideration of the execution of said premium notes and plaintiff's agreement to pay defendant's agent the first installment of $36.18."

In addition to expressly stating that they did not agree to pay the premium for the appellee for the first year, the agents state, "We pigeon-holed the application for the telephone call from Mr. Maker and he never did telephone us."

We have diligently and scrupulously read and re-read the evidence in the case with an interest, to find in it, if it could be found, where any expression was used, or a statement was made, by a witness, that might be construed to have been understood by the appellee as a promise on the part of the agents that they would pay the first premium and that he would pay them. The strongest statement made by the appellee in his testimony on this point is:

> "They was to take care of me on this policy business, the first premium for two or three or four weeks. I went ahead and traded and he wrote up the application and I signed it."

If his property had been destroyed at any time during the two, three, or four weeks following the 17th day of December, there might be a plausible reason for believing that he was induced to believe that the agents were to take care of the payment of the first premium for him during that time. But it is not shown that they agreed to take care of it for or during that time, much less practically two months from the 17th of December up until the fire occurred.

The fact that the note was executed for the premiums for the years subsequent to the first of the five years which the policy was to cover corroborates this theory of the case. It is further substantiated by the fact that the property was not occupied at the time and that it would require time for him to begin to occupy it, according to his intentions expressed at that time, and that that much time would be needed to get the application to, and the policy returned by, the company. The agents say they "pigeon-holed" the application to await a telephone message from the appellee. But be that as it may, he did not pay, in the two, three, or four weeks, or at all, the first premium for the first year. He gave no further attention to the subject, made no inquiry about it, nor did he offer, or make any effort after the expiration of either two, three, or four weeks, to pay the first premium to the agents. If this was an action to recover the first premium of the appellee, either by the agents or the company, under the alleged arrangements shown in the evidence, instead of an action to recover on the alleged oral contract for the loss of his property by fire, a recovery thereof would not be authorized by the evidence offered and now appearing in the record. To be a valid enforceable contract, it must be bilaterally and mutually binding on the partes to it. It cannot be said that it is shown by the evidence that the appellee obligated himself to pay the first premium, either during the first two, three, or four weeks, or thereafter. It is shown merely that an incomplete, indefinite, conditional, and tentative arrangement was made by and between the appellee and the agents of the appellant for term insurance on his property, beginning January 1, 1929, and ending January 1, 1934. Such contract must be clearly and convincingly established in every particular. California Ins. Co. v. Settle, 162 Ky. 82, 172 S. W. 119; Cyc. of Law of Ins. (Couch) vol. 1, sec. 82. p. 142. The conduct of appellee

shows that it was abandoned and not carried out by him. It cannot be said, giving due regard to the evidence in the case, that even under the scintilla rule the appellee has established all of the essential elements of a valid enforceable oral contract of insurance, entitling him to require appellant to pay him for the loss of his property. The company is entitled at least to a tolerably fair consideration in such cases, and a claimant should be required to show by some semblance of evidence a mutually binding enforeable contract of insurance before it should be compelled to pay him for the loss of his property. Hopkins v. Phoenix Fire Ins. Co., 200 Ky. 365, 254 S. W. 1041. However much we may be inclined to do so, we are not justified, in the absence of evidence showing with a reasonable degree of certainty that such contract was entered into or completed by the parties, to declare its existence and to sustain a verdict of the jury simply because it has returned it. About all that is shown by the evidence is that negotiations for insurance were entered into and abandoned by the parties.

The evidence did not authorize the verdict of the jury. Counsel for the parties have interestingly and learnedly discussed vital questions touching the subject of insurance, but, according to our view, it is not necessary to consider them in order to reach a fair and just conclusion in the case.

Wherefore the judgment is reversed, with directions to grant appellant a new trial and for proceedings consistent with this opinion.