[Civ. No. 15829. Second Dist., Div. Three. Oct. 29, 1947.]

K. C. WORKING CHEMICAL COMPANY (a Corporation), Appellant, v. THE EUREKA-SECURITY FIRE AND MARINE INSURANCE COMPANY OF CINCINNATI, OHIO (a Corporation), Respondent.

G. R. Dexter and Walter H. Robinson for Appellant.

McBain & Morgan and Angus C. McBain for Respondent.

VALLEE, J. pro tem.—Plaintiff appeals from a judgment for defendant in an action upon two fire insurance policies. All facts necessary to a recovery, if the policies were in force, were proven by plaintiff or stipulated to. The defense was that the policies were canceled before a fire occurred.

The trial court found that about February 20, 1945, respondent, in consideration of the premium charged therefor, by its agent, issued and delivered to appellant two policies of fire insurance; that the policies were California standard form; that by the policies respondent insured appellant, subject to the provisions of the policies, against loss or damage by fire to the property covered therein, in one policy in a sum not exceeding $5,000, and in the other in a sum not exceeding $3,500, for the term commencing February 20, 1945, and ending February 20, 1946, payable at Los Angeles; that the term provided by the policies was subject to the right of either party to cancel as provided by its terms and of the parties to cancel by mutual agreement; that the property insured

consisted of soap and materials for soap making, and machinery, equipment and materials all owned by appellant; that on April 7, 1945, the insured property was totally destroyed by fire without the act or fault of appellant; that by the destruction of the property appellant suffered a loss of $11,440.73 as to the property described in one policy, and $6,525.50 as to the property described in the other policy; that no part of the loss had been paid by respondent; that notice of loss and proof of loss were given in writing within the time prescribed by the policies; that in all respects appellant has performed and complied with all of the conditions of the policies on its part to be performed had the policies been in force and effect; that respondent has repudiated the existence of the policies and has refused to recognize them as in existence since March 31, 1945; that on March 31, 1945, and prior to the fire, the policies, and each of them, were by mutual agreement between appellant and respondent, through their agents and servants acting within the scope of their authority as such, and for a valuable consideration, canceled, and the policies and each thereof were, upon said date, surrendered and delivered to the possession of respondent by appellant; that on March 31, 1945, and prior to the fire, appellant did cancel the policies and each of them and did notify respondent of such cancellation and did surrender the possession of said policies to respondent, and did replace said policies of insurance with insurance bound in other insurance companies; that respondent did join in, approve and agree to said cancellation of the policies on March 31, 1945, and by reason of said cancellation, the terms of insurance expired on March 31, 1945. [These findings are inconsistent. If the policies were canceled by mutual agreement they were not canceled by appellant alone. If they were canceled by appellant alone they were not canceled by mutual agreement.]

Appellant contends (1) that the trial court erred in its rulings on the admission of evidence, and (2) that there is no evidence to support the findings of cancellation. It will not be necessary to consider appellant's contentions with respect to rulings upon the admission of evidence as, under the view we take of the case, there is no evidence to support the findings that the policies were cancelled either by mutual agreement or by appellant.

The evidence upon the issue of cancellation is meager. No written notice of cancellation was given by respondent to

appellant. One Legman, a licensed insurance broker, acted as such for appellant in placing the insurance represented by the policies in suit. The policies were delivered to Legman about February 23, 1945. About three weeks thereafter, respondent's general agent telephoned Mrs. Legman (employed in Legman's office), told her that the company was dissatisfied with the risk and asked that the policies be returned for cancellation. About that time Legman became ill and one Elwood, an employee of Legman, without an agent's or broker's license at the time, on March 28, 1945, telephoned Working, president of appellant, and told him that he had the policies and that respondent had requested the return of the two policies because on inspection the risk did not meet their underwriting approval and most probably that he [Elwood] would have to place that coverage "board." Working handled all of appellant's insurance matters. Working told Elwood that he [Working] thought he was paying too much for his coverage as it was, because the chemicals that he had on the premises were not conducive to the cause of a fire; that in fact they would put fire out. Elwood told Working that he would relay this information in his attempt to place the coverage, and place it "non-board," if possible, but it did seem like a "board" risk. Working said to Elwood, "Under the circumstances, all right, go ahead and do the best you can for me." Elwood testified that that was all of the conversation as he remembered it; that "attempts were made by others than myself prior to the request for *me* to try to obtain coverage." Working testified that he told Elwood, in the conversation just referred to, that he [Elwood] had no authority to cancel; that he told him to see if he could obtain other insurance; that he told him not to cancel the policies; that Legman was agent of appellant only for the purpose of securing insurance. Working's testimony that he told Elwood not to cancel was not directly contradicted by Elwood. Working testified that he did not hear anything further from either Elwood or Legman prior to the fire. After Elwood talked to Working on the telephone, and on March 28, 1945, Elwood telephoned to a Mrs. McDermott, an employee in the office of one Lovinger, an insurance broker. Legman and Lovinger "got together occasionally on difficult policies to place." Elwood asked Mrs. McDermott to try and place the coverage and relayed to her the information which had been given him by Working regarding the chemicals he

had on hand and his claim that he was being overrated and for Lovinger to try and place the coverage "non-board" if they couldn't place it "board" (sic) as Working had requested. Elwood further testified that on March 29, 1945, Mrs. McDermott called him and stated that the coverage had been placed "board"; that she did not say what company. At that time, Mrs. McDermott was employed by two insurance brokers, Lovinger and Donin. She did not have a broker's license. Mrs. McDermott testified that she received a telephone call from Elwood regarding appellant's insurance in the latter part of March, 1945; that Elwood said that he had a line to place and whether we could take care of it and then he gave the name of the company and its location; that he told her it was on stock and, she thought, on fixtures; that she was not real positive as to the amount; that she told Elwood that she would take it downstairs to the Old Line Agencies [insurance brokers] and try to place it; that following the conversation she wrote up the order and on the same day took it down to Mrs. Fine, an insurance broker employed by Old Line Agencies; that she gave Mrs. Fine the order and asked her [Mrs. Fine] whether it could be placed "non-board"; that Mrs. Fine said they couldn't place it "non-board" and would have to place it "board"; that Mrs. McDermott said, "you keep it bound until I call on it to Mr. Elwood and give him the rate and see whether it will be satisfactory"; that she did not know what Mrs. Fine said when she told her to keep it bound; that "I guess she said—well, she stamped it up and put it with her orders for policies"; that she didn't know that she particularly "guessed," that that was the usual procedure and that many times they would put an order on Mrs. Fine's desk and "nothing said"; that she then looked up the "board" rate and called up Elwood and gave him the "board" rate; that Elwood said that he would call up Working and see whether the "board" rate would be all right [Elwood did not testify that he talked to Working to see if the "board" rate was all right. Working's testimony was to the effect that he did not]; that she did not tell Elwood anything about whether the risk was bound or not; that to the best of her memory the next day Elwood called up and said the rate would be all right and to write up the policy; that she said "all right"; that she then went downstairs and told Mrs. Fine to write up the policies; that the "board" rate was satisfactory; that she did not remember Mrs. Fine's conversation "because we have so many

policies. Maybe she did not say anything for all I know"; that she did not recall whether she talked to Elwood after he said the "board" rate was all right; that when she called Elwood up about the "board" rate she told him, "We have bound the risk pending the approval of the board rate" by Mr. Working; that about four or five days after the order was placed she heard of the fire; after that she went to see Mrs. Fine and said to her, "What do you know, that soap place has had a fire"; that Mrs. Fine pulled the order out from her stack of orders and told her assistant, "We will write the policies before we report the loss"; that while she was talking to Mrs. Fine, Mr. Kleiner (apparently president of Old Line Agencies), came in the office and she said the same thing, that they had a fire; that in the course of the conversation Legman's name was spoken and Kleiner wanted to know if Legman placed the order, and she [Mrs. McDermott] said "yes"; that then Kleiner denied liability; that Kleiner did not say anything denying liability in substance or effect before Legman's name was mentioned; that she placed orders in a similar manner before; that she never saw any policy written up covering the order she had placed with Mrs. Fine; that no policies were written; that when she testified that she did not tell Elwood that the risk was bound and later testified that she did tell him, she meant that after Elwood said that the board rate would be acceptable she went down and told Mrs. Fine to write up the policies and when Elwood said the rate would be acceptable she (Mrs. McDermott) said to Elwood, "all right, it is bound"; that the reason she told Elwood it was bound was that "when we give an order to the underwriter it is assumed at once that it is bound; that that is the usual custom of handling our business"; that she made the statement to Elwood that it was bound on the assumption that it was bound; that she thought it was bound; that she never saw any paper or writing showing or approving or confirming the bind; that the order she filled out was an Old Line Agencies' form.

Mrs. Fine testified that in March, 1945, she was chief underwriter for Old Line Agencies on fire insurance; that about 90 per cent of orders that came in over the phone or in person from brokers for fire insurance coverage came to her; that Old Line Agencies had the agency for several fire insurance companies; that one of them was Home Fire & Marine Insurance Company; that in 1945, Old Line received orders for fire insurance; that she countersigned the policies of Old

Line Agencies; that upon receipt of telephone orders she quite often bound them verbally over the telephone; that Old Line frequently bound the coverage when insurance brokers came into the office in person and requested coverage; that that happened frequently; that when she bound insurance on such a request she would issue policies or written cover notes [a cover note is a writing given to the insured to bind the company in case a loss occurs pending action upon the application and the actual issuance of a policy. It is sometimes referred to as a "binder." (Ins. Code, § 382; *Duncan* v. *John Hancock Mut. L. Ins. Co.*, 137 Ohio St. 441 [31 N.E.2d 88, 90]; *State Distributing Corp.* v. *Travelers Indemnity Co.*, 224 N.C. 370 [30 S.E.2d 377, 379]); that if a cover note was issued, the original cover note, or if a policy was issued, the policy, was sent to the company, a copy to the agent, and Old Line kept a copy; that for several years prior to April 1, 1945, and since, she had been issuing binders and cover notes or policies for Home Fire & Marine Insurance Company; that Home Fire & Marine accepted those coverages; that occasionally Home did not agree with Old Line and asked it to return a policy to cancel it; that she had authority to do those things for Home Fire & Marine Insurance Company; that prior to April 1, 1945, Old Line had bound risks at the request of Lovinger or Mrs. McDermott. Mrs. Fine did not testify that she bound appellant's risks or that she issued a cover note or a binder or a policy.

Between March 10 and March 31, 1945, respondent's general agent made repeated demands upon Elwood and Legman's wife, for return of the policies. Elwood told respondent's general agent about March 29th or 30th, 1945, that he had been successful in placing the insurance "board"; that it had been necessary to place the insurance with another broker who had placed it with the Old Line Underwriters. Respondent received the policies from Elwood on March 31, 1945, and stamped them "Cancelled Flat — No Charge." Thereafter, and before April 7, 1945, Elwood told respondent's general agent that he did not have a cover note or a policy on the risk; that he did not have a written cover note in his possession; that he just had a telephone confirmation. Respondent's general agent testified that at the time of this last conversation in April he was in doubt as to whether or not respondent was released by the action he had taken on these policies "because Elwood would not release those policies to me. He had them in his possession all the time, of

course, and he told me he would not release those policies to me until he was sure Mr. Working was insured elsewhere and he had received his permission to return the policies to us." Legman testified that over a period of three or four years prior to March, 1945, he had placed more than ten policies through the Lovinger office; that Lovinger, in turn, placed for him through "board" companies; that Lovinger placed several of the policies in the Loyalty Group, some in National Automobile, and quite a number in Home Fire & Marine Insurance Company where "most of the policies were placed through the Lovinger office for our office"; that "the majority of the policies were placed in the Home Fire & Marine; all board policies, I would say, were placed in the Home Fire & Marine"; that they were placed through Old Line Agency; that about the middle of March, 1945, respondent's general agent talked to him and requested that the policies be returned for cancellation; that he told the agent to give him a little time so that he could replace the policies elsewhere before he returned them for cancellation. From February 23, 1945, to March 28th or 29th, 1945, the policies were in Legman's office. They were mailed by someone in Legman's office to respondent's general agent. The date of mailing is not fixed definitely. Elwood never received from any company a cover note in writing providing for the new insurance. He never learned what company, if any, it was that the new insurance was "placed in" or "taken by." Elwood never received any written communication from respondent in which a desire on its part was expressed for cancellation of either one or both of the policies. Legman never learned in any way, either in writing or verbally, what company it was that the claimed binder was made with. He was never informed. He never received from anyone a written confirmation of the binder. He assumed it was the Home Company because he had placed orders through Lovinger's office on a "board" company time and again in the past and the policies always came through in the Home, so he had no reason to question the name of the company. That is all the information he had on the matter. He never received any policies covering the property covered by the policies in suit from any company other than those he received from respondent and sued upon herein.

Each of the policies sued upon contained the following provision: "This policy shall be canceled at any time at the request of the insured, in which case the company shall, upon

surrender of this policy, refund the excess of paid premium above the customary short rates for the expired time. This policy may be canceled at any time, without tender of unearned portion of premium, by the company, by giving five (5) days' written notice of cancellation to the insured and to any mortgagee or other party to whom, with the written consent of the company, this policy is made payable, in which case the company shall, upon surrender of the policy or relinquishment of liability thereunder, refund the excess of paid premium above the pro rata premium for the expired time.'' (Ins. Code, § 2071.)

Accepting, as we must, all of the evidence tending in any degree to support the findings with respect to cancellation as true and drawing all reasonable inferences that may be drawn from the evidence, we are of the opinion that there is no evidence to support the findings as to cancellation. The evidence is without conflict that Elwood's authority to cancel was conditioned upon his procuring new insurance. He had no authority to cancel until he had secured the new insurance. If new insurance was not procured Elwood had no authority to cancel. His returning the policies to respondent was ineffective to cancel and the policies were in force on the date of the fire. Respondent concedes that it is the general rule that a broker appointed by an assured to procure insurance does not ordinarily have authority to cancel existing policies. Counsel argues that authority to cancel may be shown to have been conferred upon the broker, citing *Stevenson* v. *Sun Insurance Office*, 17 Cal.App. 280, 286 [119 P. 529]. We do not question this rule of law, but here the authority to cancel was conditioned upon new insurance first being procured. An agent authorized to procure insurance is not thereby made the agent of the assured to cancel a policy. (*Quong Tue Sing* v. *Anglo-Nevada Assur. Corp.*, 86 Cal. 566, 571 [25 P. 58, 10 L.R.A. 144]; *Lauman* v. *Springfield Fire etc. Ins. Co.*, 184 Cal. 650, 652 [195 P. 50]; *Cronenwett* v. *Iowa Underwriters*, 44 Cal.App. 571, 575 [186 P. 824].) Authority to keep property insured is not authority to consent to a cancellation of insurance which would leave the property wholly without insurance. (*Lauman* v. *Springfield Fire etc. Ins. Co., supra.*) Elwood's possession of the policies did not make him the ostensible agent of appellant for the purpose of having the policies cancelled. (*Hooker* v. *American Indemnity Co.*, 12 Cal.App.2d 116, 120

[54 P.2d 1128].) There is no question of ostensible agency in the case. Elwood's authority was actual and express. Respondent knew that Elwood's authority to cancel was conditioned upon his procuring new insurance.

The new insurance, if it was procured, must have consisted of a contract between appellant and some fire insurance company. ■ A parol contract is valid and enforceable. (*Harlow v. American Equitable Assur. Co.*, 87 Cal.App. 28, 31 [261 P. 499]; *Kleiber M. T. Co.* v. *International I. Co.*, 106 Cal. App. 709, 719 [289 P. 865].) ■ In order to establish cancellation of a policy of insurance it must be shown either that the conditions upon which the company was allowed to cancel the policy were strictly complied with, or that the insured, knowing all the facts, waived such compliance. (*Quong Tue Sing* v. *Anglo-Nevada Assur. Corp.*, supra, 86 Cal. 566, 571.) ■ The burden of proving cancellation is upon respondent. (*Rossini* v. *St. Paul Fire etc. Ins. Co.*, 182 Cal. 415, 420 [188 P. 564]; *Bebbington* v. *California Western etc. Ins. Co.*, 30 Cal.2d 157, 158 [180 P.2d 673].) ■ It is true, as respondent suggests, that where a parol contract of insurance is made, both parties will be presumed to have entered into the contract with reference to the statutory form. However, there must be a contract. There is not a scintilla of evidence in the record that any contract for new insurance was ever made. " 'To constitute a verbal contract of insurance the minds of the parties must have met upon all of the essentials of the contract. The testimony must make clear the subject-matter of insurance, the amount and elements of the risk, including its duration in point of time and extent in point of hazard assumed, the rate of premium, and generally all the circumstances which are peculiar to the contract and distinguish it from every other so that nothing remains to be done but to fill up the policy and deliver it, on the one hand, and pay the premium on the other.' (*Benner* v. *Fire Ass'n. of Philadelphia*, 229 Pa. 75 [78 A. 44, 46, 140 Am.St.Rep. 706].)." (*Dutton D. Co.* v. *United States F. & G. Co.*, 136 Cal.App. 574, 576 [29 P.2d 316].) ■ Oral contracts of insurance must be definite and certain. The parties must agree on all of the essential terms. (*Bridges* v. *St. Paul Fire & Marine Ins. Co.*, 102 Neb. 316 [167 N.W. 64, L.R.A. 1918D 1199]; *State ex rel. Fishback* v. *Universal Service Agency*, 87 Wash. 413 [151 P. 768, Ann.Cas. 1916C 1017]; *Whitman* v. *Milwaukee Fire Ins. Co.*, 128 Wis. 124 [107 N.W. 291, 116 Am.St.Rep. 25, 5 L.R.A.N.S. 407]; note 15 A.L.R. 999.)

■ To constitute a valid contract of insurance the minds of the parties must have met on the identity of the person with whom they are dealing. (*Ludwinska* v. *John Hancock Mut. Life Ins. Co.*, 317 Penn. 577 [178 A. 28, 98 A.L.R. 705, 707].)

■ A contract of insurance is not effected by a transaction which does not supply the element of mutuality of agreement and mutuality of obligation. (*Mutual Life Ins. Co.* v. *Young*, 23 Wall. 85 [23 L.Ed. 152] ; *Employers' Liability Assur. Corp.* v. *Frost*, 48 Ariz. 402 [62 P.2d 320, 107 A.L.R. 1413, 1416] ; *Goddard* v. *Monitor Mutual F. Ins. Co.*, 108 Mass. 56 [11 Am. Rep. 307]) ; *Carleton* v. *Patrons' Androscoggin Mut. Fire Ins. Co.*, 109 Me. 79 [82 A. 649, 39 L.R.A.N.S. 951] ; *Bridges* v. *St. Paul Fire & Marine Ins. Co.*, *supra*, 102 Neb. 316 [167 N.W. 64, L.R.A. 1918D 1199] ; *Dorman* v. *Connecticut Fire Ins. Co.*, 41 Okla. 509 [139 P. 262, 51 L.R.A.N.S. 873] ; *Whitman* v. *Milwaukee Fire Ins. Co.*, *supra*, 128 Wis. 124 [107 N.W. 291, 116 Am.St.Rep. 25, 5 L.R.A.N.S. 407] ; *American Surety Co. of New York* v. *Commonwealth*, 180 Va. 97 [21 S.E.2d 748].) ■ Until an application for insurance is accepted, no contractual relation exists between an applicant for insurance and an insurance company. (*Linnastruth* v. *Mutual Benefit etc. Assn.*, 22 Cal.2d 216, 219 [137 P.2d 833] ; *Carleton* v. *Patrons' Androscoggin Mutual Fire Ins. Co.*, *supra; Bridges* v. *St. Paul F. & M. Ins. Co.*, *supra; Shawnee Mut. Fire Ins. Co.* v. *McClure*, 39 Okla. 535 [135 P. 1150, 49 L.R.A.N.S. 1054] ; *Dorman* v. *Connecticut Fire Ins. Co.*, *supra; Prudential Fire Ins. Co.* v. *Stanley*, 191 Okla. 506 [131 P.2d 88] ; *Wheelock* v. *Clark*, 21 Wyo. 300 [131 P. 35, Ann.Cas. 1916A 956] ; notes 107 A.L.R. 1421; 9 Ann.Cas. 221; 21 Ann.Cas. 796; Ann.Cas. 1916B 677.) ■ An insurance company is not bound to accept an application or proposal for insurance but may reject it for any reason or arbitrarily. (*Mutual Life Ins. Co.* v. *Young*, *supra*, 23 Wall. 85 [23 L.Ed. 152] ; *Cauman* v. *American Credit Indemnity Cc. of New York*, 229 Mass. 278 [118 N.E. 259, Ann.Cas. 1918E 481] ; Note 107 A.L.R. 1421.) ■ A mere intention or mental determination on the part of the insurer to accept the application is not of itself sufficient to effect a binding contract. (*New* v. *Germania Fire Ins. Co.*, 171 Ind. 33 [85 N.E. 703, 131 Am.St. Rep. 245] ; *Hopkins* v. *Phoenix Fire Ins. Co.*, 200 Ky. 265 [254 S.W. 1041] ; *Simmons* v. *State Farm Mut. Automobile Ins. Co.* (La.App.), 11 So.2d 703.) ■ A contract of insurance must be assented to by both parties either in person or by their agents. (*Alliance Marine Assur. Co.* v.

*Louisiana State Ins. Co.*, 8 La. 1 [28 Am.Dec. 117].) ▉ There can be no enforceable contract of insurance if the insured and an agent who represents several companies fail to designate one of the companies before a loss occurs. (*Hartford Fire Ins. Co.* v. *Trimble*, 117 Ky. 583 [78 S.W. 462] ; *Hopkins* v. *Phoenix Fire Ins. Co., supra,* 200 Ky. 365 [254 S.W. 1041, 1043] ; *Kleis* v. *Niagara Fire Ins. Co.,* 117 Mich. 469 [76 N.W. 155, 156] ; *Springfield Fire & Marine Ins. Co.* v. *Hubbs-Johnson M. Co.* (Tex. Com. App.), 42 S.W.2d 248, 251; *Ogle Lake Shingle Co.* v. *National Lumber Ins. Co.,* 68 Wash. 185 [122 P. 990, 991] ; *Hamp* v. *Havens,* 169 Wash. 332 [13 P.2d 75] ; *Sholund* v. *Detroit Fire & Marine Ins. Co.,* 172 Wash. 111 [19 P.2d 395].) It is held in a number of cases that payment of the premium is a condition which must be fulfilled if temporary insurance is to be considered as affording protection to the applicant. (*Union Cent. Life Ins. Co.* v. *Robinson* (5th Cir.), 148 F. 358 [78 C.C.A. 268, 8 L.R.A.N.S. 883] ; note 81 A.L.R. 340.) ▉ Mere delay in acting on an application does not create a contract of insurance (*Linnastruth* v. *Mutual Benefit etc. Assn., supra,* 22 Cal.2d 216, 220 ; *Lucas* v. *Metropolitan Life Ins. Co.,* 14 Cal.App.2d 676, 680 [58 P.2d 934].)

In *Law* v. *Northern Assurance Co.,* 165 Cal. 394, 399 [132 P. 590], the oral statements were much stronger than in the instant case. In the *Law* case, Sturtevant was the broker of the insured, having secured a "cover note" from Northern which expired April 18, 1906, at noon. H. C. Ahpel was the city agent of Northern. On March 19, 1906, Sturtevant and Ahpel met and Sturtevant said to Ahpel, " 'Henry, I have just got a line on the Fairmont that I can give you.' After some conversation, in which Mr. Ahpel learned that the building would be completed in October or November, he agreed to take $25,000 of the insurance. He asked Mr. Sturtevant if he, Ahpel, would 'get the renewal' and the reply was 'Sure, Henry.' " The Supreme Court held that the foregoing did not create an oral contract of insurance and said (p. 400) : ". . . while a parol contract of insurance may be made, proof of such an agreement must be clear and convincing, because, ordinarily, insurance is obtained by the issuance of elaborate written policies. (*American Can Co.* v. *Agricultural Ins. Co.,* 12 Cal.App. [133] 135 [106 P. 720].)" The facts in *American Can Co.* v. *Agricultural Ins. Co., supra,* 12 Cal.App. 133, square almost to a "T" with those here. Roy was the broker for the insured plaintiff. Fred Brown was the clerk of Edward Brown & Sons, agents of Agricul-

tural Insurance Company, with authority to accept business and issue cover notes but not to make out or sign policies. The policy was to expire on April 18, 1906, at noon. On April 17, 1906, Roy prepared slips for the renewal of the policy which was to expire the following day. Late on the afternoon of April 17th, Roy took the slips to the office of Edward Brown & Sons and in his language, which was not contradicted, said: " 'So I stepped in behind the counter, as in fact I was accustomed to do, and Mr. Brown here [pointing to a person in the courtroom] was at his desk putting his things away, that is, Mr. Fred Brown; he had charge of the city department, so I said, "Here, Fred, are some renewals for you," and Fred says, "All right." As I turned around and went out I think he put them in a drawer of his desk. This was about all that was said about it.' " The court held that the evidence was insufficient to prove an oral contract and reversed a judgment for the plaintiff. It said that the answer of Brown, "All right," did not mean anything more than that he would take the matter up in due course. The court further stated (p. 135) : "A parol contract of insurance may be made and is enforceable; but as such contracts are rarely made, and are not made in the usual and ordinary course of business, the proof of such oral contract must be clear and convincing. In fact, it is the universal custom of insurance companies to issue written policies, with full and minute specifications as to their liability and the exceptions that would make the policy void. The preliminaries, as in contracts for the sale of real estate, are usually only negotiations which are afterward merged into the written contract. Hence it is at once apparent, even to the laymen, that in the somewhat unusual claim that an oral contract of insurance was entered into, the only safe and sound rule is to require the proof to be clear and convincing to the effect that the contract was actually entered into, that each party understood it in the same light, and in regard to the same subject matter. (Kerr on Insurance, 52, § 33; 13 Am. & Eng. Ency. of Law, p. 221; *Cleveland Oil & Paint Mfg. Co.* v. *Norwich Union Fire Ins. Co.*, 34 Ore. 228 [55 P. 435].) . . . A contract is an agreement to do or not to do a particular thing. It must be by consent, which is free, mutual and communicated by each to the other. The consent is not mutual unless the parties all agree upon the same thing in the same sense, and unless they do so agree there is no contract." (To the same effect, upon analogous facts, see *Taylor* v. *Phoenix Ins. Co.*, 47 Wis. 365

[2 N.W. 559, 3 N.W. 584] ; *Idaho Forwarding Co.* v. *Fireman's Fund Ins. Co.*, 8 Utah 41 [29 P. 826, 17 L.R.A. 586] ; *Consumers' Match Co.* v. *German Ins. Co.*, 70 N.Y.L. 226 [57 A. 440] ; *Whitman* v. *Milwaukee Fire Ins. Co.*, supra, 128 Wis. 124 [107 N.W. 291, 116 Am.St. Rep. 25] ; *Cleveland Oil & Paint Mfg. Co.* v. *Norwich Union Fire Ins. Soc.*, 34 Ore. 228 [55 P. 435] ; *Dinning* v. *Phoenix Ins. Co.*, 68 Ill. 414; *May* v. *Standard Fire Ins. Co.*, 220 Mich. 455 [190 N.W. 240] ; *Continental Ins. Co.* v. *Baker*, 238 Ky. 265 [37 S.W.2d 62] ; note 15 A.L.R. 1004.) ▮ The return of the policies to the company's general agent did not effect a cancellation at the request of the insured or by mutual consent. (*Emery* v. *Pacific Employers Ins. Co.*, 8 Cal.2d 663, 670 [67 P.2d 1046] ; *Hooker* v. *American Indemnity Co.*, 12 Cal.App.2d 116 [54 P.2d 1128].)

▮ The real test of whether new insurance had been procured is whether appellant could have recovered for the loss from some company other than respondent. That appellant could not have recovered against some other company is clear from *Law* v. *Northern Assurance Co.*, supra, 165 Cal. 394; *American Can Co.* v. *Agricultural Ins. Co.*, supra, 12 Cal.App. 133; *Toth* v. *Metropolitan Life Ins. Co.*, 123 Cal. App. 185 [11 P.2d 94] ; and *Walters* v. *West American Ins. Co.*, 4 Cal.App.2d 581 [41 P.2d 355]. Cases cited by respondent are of no assistance. In all of them that have any bearing at all upon the question, the substituted or new insurance was in fact obtained and in force before cancellation of the prior policy. An illustration is *Home Ins. Co.* v. *Campbell Mfg. Co.* (4th Cir.), 79 F.2d 588.

▮ The evidence is entirely too vague, indefinite and uncertain to establish a contract for the new insurance. The evidence of conversations between Elwood and Mrs. McDermott, who was merely an agent of appellant with respect to the procuring of the new insurance, and statements by Mrs. McDermott when she delivered the order to Mrs. Fine, with no money passing and no definite promise, is insufficient to establish a parol contract of insurance. There is a lack of agreement as to several essential elements of a contract. There was no meeting of the mind of appellant with any fire insurance company as to any of the essential terms or elements of a contract. What company was to carry the new insurance? That it was Home Fire & Marine Insurance Company, as respondent asserts, is supposition and surmise, nothing more. Old Line Agencies had the agency for a number

of fire insurance companies. With which one was Mrs. Fine going to place appellant's order? The evidence does not reveal. There could be no contract until Old Line designated with certainty the company to be bound. It is evident that the trial judge was at a loss to determine the company in which the new insurance was placed. He did not find that it was placed in a particular company. His finding was that the policies with respondent were replaced "with insurance bound in other companies." Was there to be one or two policies? If one, was the amount to be $5,000 or $8,500? If two, what was to be the amount of each? What was the duration of the insurance? What was the amount of the premium to be paid? Were any limiting or burdening clauses to be attached to the policy to be issued? (Ins. Code, § 2080.) The evidence is silent as to all of these matters. They are not prescribed by the standard form. (Ins. Code, § 2071.) No premium was paid. No cover note or binder or memorandum of any kind was issued. Appellant's application was never accepted by any company. Mrs. Fine's intention or mental determination, if there was such, to accept the application on behalf of some company was not sufficient to effect a binding contract. Her delay in acting upon the application did not create a contract. There was neither mutuality of agreement nor mutuality of obligation. The fact that the Legman office mailed the policies to respondent's general agent about a week before the fire occurred and that the general agent stamped "Cancelled" on the policies did not affect a cancellation. In the absence of authority in the Legman office to cancel, or of a mutual agreement between appellant and respondent to cancel the policies, they could only be cancelled in the manner provided in the policies, i. e., at the request of the insured, or by the company upon giving five days' written notice of cancellation to the insured. There was no request of the insured to cancel and there was no written notice given by the company. All there is in the evidence is a delivery of an order for insurance to Mrs. Fine, a statement by Mrs. Fine that they would have to place it "board," a request to Mrs. Fine to keep it "board" without any response by Mrs. Fine. There was not even the response, "All right," which was held insufficient to create a contract in *American Can Co.* v. *Agricultural Ins. Co., supra,* 12 Cal.App. 133.

The evidence is wholly lacking in details essential to prove a contract. There is no evidence that a contract was effective *in praesenti.* No contract for new insurance was entered into.

Without that contract Elwood was without authority to cancel the policies with respondent. The policies were not cancelled. They were in full force on the date of the fire.

Judgment reversed.

Shinn, Acting P. J., and Wood, J., concurred.